WILLIAM G. NICKERSON vs. STEPHEN M. WELD & others.

Suffolk.    November 19, 1909. — January 8, 1910.

Present: KNOWLTON, C. J., MORTON, BRALEY, SHELDON, & RUGG, JJ.

*Contract*, What constitutes, Rescission.   *Frauds, Statute of.*   *Evidence*, Extrinsic affecting writings.

In a suit in equity to enforce the specific performance of an alleged contract to sell certain land to the plaintiff, it appeared that the defendant, one W., owned the land in question and other land in the neighborhood, a large part of which was not subject to any restrictions, and that the defendant's agent with the defendant's knowledge and approval sent to the plaintiff a letter describing the land and agreeing to sell it to the plaintiff for a price named "subject to the usual W. restrictions which cover this neighborhood," adding "I think you know them all, but I will be glad to send you a copy if you care to see them." Thereupon the plaintiff asked for a copy of "the usual W. restrictions," and the defendant's agent sent the plaintiff a copy of an agreement between W. and one P. to whom W. had conveyed land in the vicinity of the land in question. The agreement contained a statement of certain restrictions, a covenant on the part of P. to hold his land subject thereto during a certain period, and a covenant by the defendant to hold certain land of his own, including a part of that here in question, subject to the same restrictions for the same period. A master to whom the case was referred found that it was a term of the oral contract between the parties, of which the agent's letter was a memorandum, that the land should be conveyed subject to "the usual W. restrictions," that this phrase was intended by the defendant and his agent to mean those restrictions which already had been imposed by the agreement of P., and that at the time of the oral contract the plaintiff understood this phrase to refer to some restrictions existing on the land but did not have in mind the agreement of P. until it was sent to him by the defendant's agent, after which he wrote to the defendant's agent reciting his purchase and agreeing to pay the stipulated price. The master also found that there was no dispute between the parties as to these restrictions until a disagreement had arisen between them as to other matters. The defendant contended that the minds of the parties never met upon the matter of the restrictions, which was a material part of their bargain, and therefore that no contract was made. *Held*, that the phrase "the usual W. restrictions" used in the letter of the defendant's agent had been fixed and made certain through the subsequent adoption by the parties of the restrictions in the agreement of P. as the ones intended by the words used, and that a final and complete agreement had been reached between the plaintiff and the defendant.

A memorandum of a contract for the sale of land belonging to one W. signed by the agent of W., which contains in all other respects a complete statement of the agreement of the parties but refers to restrictions to which the land is subject as "the usual W. restrictions," offering to send the purchaser a copy of such restrictions if he cares to see them, can be made a complete memorandum of the contract sufficient to satisfy the requirements of R. L. c. 74, § 1, cl. 4, as against

W. by showing that a copy of an instrument in writing signed by W. and another person containing the restrictions referred to was furnished by W. at the request of the purchaser and was accepted by the purchaser as a statement of the restrictions intended by the parties and referred to in the memorandum, and it is immaterial whether the copy of the previous instrument containing the restrictions was made before or after the memorandum was signed by the agent of W.

In a suit in equity to enforce the specific performance of a contract to sell certain land to the plaintiff, if it appears that the defendant said that he would throw up the contract unless certain claims made by him were conceded and that the plaintiff replied " All right," this does not necessarily show a rescission of the contract by mutual consent, and a finding of a master to whom the case was referred that the defendant's remark was not intended as anything more than a tentative suggestion, if supported by other facts reported by the master, will not be revised.

BILL IN EQUITY, filed in the Superior Court as amended on May 18, 1908, to enforce the specific performance of an alleged contract to sell to the plaintiff about forty acres of land in Dedham.

The defendants demurred to the bill, and the demurrer was overruled. The defendants filed an answer, and the case was referred to William D. Turner, Esquire, as master. He filed a report stating findings in favor of the plaintiff. Upon a motion by the defendants the case was recommitted to the master for such additional findings as might be warranted by the evidence upon the two following questions :

" 1. Whether the reference to ' the usual Weld restrictions which cover this neighborhood ' in the negotiations, and in the letter of the broker Balch to the plaintiff dated October 29, 1906, was made, intended and understood by the parties and the broker as a mere recital of fact, or as a term of the contract providing the restrictions subject to which the defendant should convey ; and,

" 2. Whether or not one of the terms of the oral contract of the parties was that all the land should be conveyed subject to ' the usual Weld restrictions.' "

The master filed a supplemental report in which he made the following findings :

" At the interview between Balch and the plaintiff, at which the oral contract was concluded, Balch referred to the restrictions as already existing, and as known to the plaintiff. All the terms of the oral contract were covered and accurately

expressed by the letter or memorandum signed by Balch. The plaintiff understood that these restrictions already existed, but both Balch and the plaintiff also intended and understood that the reference to these restrictions was not a mere or unimportant recital of fact which could be disregarded if the fact turned out to be the other way.

"The land was offered and accepted as wholly restricted, and both parties intended that the deed which the plaintiff should receive should express and thus reimpose these restrictions, and, therefore, the reference to 'the usual Weld restrictions' was not only a recital of fact, but also a term of the contract which was to be carried out; but the plaintiff did not understand that the restrictions were to be framed or settled by means of further negotiations, because he accepted Balch's representation and understood it according to the natural meaning of Balch's language as referring to restrictions already legally established.

"I find, also, that Balch likewise understood that these restrictions were to be recited and reimposed by the conveyance to the plaintiff, and that he had in mind by the phrase 'the usual Weld restrictions' those embodied in the Potter agreement, which were 'usual' in the sense that Weld usually restricted land which he conveyed away, and by restrictions which were similar in many respects, although not absolutely identical.

"There was no direct testimony as to the extent of Balch's knowledge of the imposition of the Potter restrictions. He understood in a general way what the defendant's wishes were from previous instructions on the subject of restrictions, and he either understood that the defendant wanted the same restrictions which already applied to a portion of the premises extended, so as to cover the remainder of the land embraced in this sale, or he supposed that this had already been done.

"In the absence of his own testimony as to the extent of his knowledge, I think I must find the latter as the true explanation, because he did not intend to deceive the plaintiff, and his representation was clearly to the effect that the restrictions existed, and that the plaintiff knew them.

" The defendant, on the other hand, must be assumed to have known the real fact; but when he read Balch's letter before forwarding it to the plaintiff, which he did hurriedly, his attention was not particularly drawn to the matter of restrictions, nor was this matter afterwards referred to by either party during the controversy which subsequently arose.

" I find, therefore, that the defendant intended this phrase of the letter to have its legal significance and to be a recital of existing facts.   If not wholly true at the time, it could be made true when the deed to the plaintiff was passed, because the defendant also intended and understood that the land should be · wholly restricted, and that these restrictions should be expressed and reimposed by the deed to be given to the plaintiff; and in this sense, therefore, the recital was also a term of the contract.   It was not a matter which either party would be at liberty to disregard.

" Upon the question whether or not one of the terms of the oral contract of the parties was that all the land should be conveyed subject to ' the usual Weld restrictions,' I find that it was a term of the oral contract that the land should be conveyed subject to what Balch called ' the usual Weld restrictions,' but that this phrase was intended by Balch and Weld to mean those restrictions which had already been imposed by the Potter agreement.   Nickerson understood this phrase at the time of the oral interview to refer to some restrictions existing on this land, but he did not have in mind the Potter agreement until it was sent him by Balch.

"There was nothing in the contract, nor in the negotiations, up to the time the contract was completed, on the subject of restrictions, except what I have found either in this or in my previous report, and the contract in this respect was never altered by the parties.

" The copy of the Potter agreement, which was sent, was understood by Balch and Nickerson as showing the restrictions already mentioned and agreed upon between them, and not as being a new set of restrictions then for the first time to be agreed upon."

The letter of Balch referred to by the master and also referred to in the opinion was as follows:

"October 29, 1906.

"William G. Nickerson, Esq.,
       60 State Street,
              Boston, Mass.

"Dear Billy: —

"In confirmation of the sale I made you this morning for Mr. Weld, I write the following as a memorandum to prevent misunderstanding.

"I have sold you some forty (40) acres of pasture and woodland on the north side of Westfield Street, Dedham, as shown approximately by the blue and red lines on the rough plan attached herewith, for the sum of Eleven Thousand (11,000) dollars cash, the papers to pass, if possible, in ten days, although Mr. Weld will extend the time if necessary. The broker's commission is to be paid by Mr. Weld and also the taxes through to May 1st next.

"This land, as you know, is subject to the usual Weld restrictions which cover this neighborhood. I think you know them all, but I will be glad to send you a copy if you care to see them.

                          "Very truly yours,
                                   "Joseph Balch.

"Dictated J. B.

"P. S. You are to provide a survey of the above in order to draw the deeds."

The Potter agreement, likewise referred to, was as follows:

"Know all men by these presents that I, Florence B. Potter, the grantee named in a certain deed to me from Stephen M. Weld, dated May 14, 1901, and recorded with Norfolk Deeds, May 16, 1901, in consideration of one dollar, do hereby for myself, my heirs, and assigns, covenant and agree to and with the said Weld, his heirs and assigns that I will and that my heirs and assigns shall hold said premises conveyed to me by said deed subject to the following restrictions, stipulations and agreements, namely, which shall remain in full force for the term of thirty years from the date of said deed, viz: —

"The granted premises shall be used exclusively for the purpose of a private residence, and no dwelling house, except

lodges for use by the private coachman, or gardeners of the owners or occupants of the granted premises shall be erected upon the premises costing less than five thousand dollars exclusive of the cellar and foundations. ' Private residence ' shall be deemed to exclude tenements, boarding houses, hotels, flats and the like.

"Stables for the private use of any of the occupants of the premises shall be permitted, but none other; and in no case shall more than two pigs be kept, and in no case shall any use be made of the portion of the premises or of any building thereupon, which is injurious, or offensive to the granted premises, or any adjoining property as first class residence property. And in consideration of the foregoing covenant by said Potter, I, the said Stephen M. Weld, do hereby for myself, and my heirs and assigns, covenant to and with the said Florence B. Potter her heirs and assigns, that I will, and my heirs and assigns shall hold my remaining land which I acquired from the Becker heirs, and also the ' Thomas Lot ' and the ' Bass lot ' conveyed to me by Nathaniel Smith, subject to the same restrictions which shall also continue in force for said period of thirty years. And it is mutually agreed that all the foregoing restrictions on said land conveyed to said Florence B. Potter, and the remaining land of said Weld above designated shall have the same force and effect as though incorporated in said deed from said Weld to said Potter.

"In witness whereof we have hereunto set our hands and seals this twenty-seventh day of May in the year of our Lord nineteen hundred and one.

"Florence B. Potter   [Seal.]

Stephen M. Weld "   [Seal.]

The case was heard by *Wait*, J., upon the defendants' exceptions to the master's original report and to his supplemental report. The judge sustained one exception, not now material, and overruled all the other exceptions, and ordered that "a decree be prepared declaring the plaintiff entitled to specific performance and ordering conveyances of the property by the defendants, subject to the restrictions set out in the Potter agreement."

A final decree was entered in accordance with this order; and

the defendants appealed, raising the questions which are stated in the opinion.

*F. Rackemann*, for the defendant Stephen M. Weld.

*H. M. Davis*, for the defendants Laurence Minot and Moses Williams, Jr., trustees, and Philip M. Weld.

*H. Livermore & E. N. Jones*, for the plaintiff.

SHELDON, J.    Three questions are raised by the defendants' appeal in this case: (1) Whether the parties completed any contract; (2) whether if so there was any memorandum in writing thereof signed by the party to be charged sufficient to bind him under the statute of frauds, R. L. c. 74, § 1, cl. 4; and (3) whether such contract afterwards was rescinded and abandoned by mutual consent.

1. The plaintiff and the defendant Stephen M. Weld, hereinafter called Weld, who then owned the land in question and other land in that neighborhood, made an agreement by which the plaintiff bought and Weld sold to him that land for a stipulated sum and on definite terms, but with the statement that the land was " subject to the usual Weld restrictions."    In fact, a large part of the land was not then subject to any restrictions. We are satisfied, however, upon the facts reported by the master, that this language was intended as a stipulation that the conveyance to the plaintiff was to be made subject to the restrictions stated.    As to this, the defendants contend that the words used, " the usual Weld restrictions," do not describe any particular restrictions which can now be fixed and determined by the court; that it is impossible to say that both parties had any definite restrictions or any one scheme of restrictions in their minds; that this question was still to be agreed upon between them; that accordingly their minds never met upon this material part of their bargain; and so that it cannot be said that there ever was concluded between them any final and definite agreement.

The plaintiff, after receiving from Balch the letter of October 29, 1906, which contains the memorandum upon which he now mainly relies, wrote at once to Balch, asking for a copy of " the usual Weld restrictions," of which Balch had said, " I will be glad to send you a copy if you care to see them."    Balch thereupon sent to the plaintiff a copy of an agreement between Weld

and one Potter, to whom Weld had conveyed land in the vicinity of the land in question. This agreement contained a statement of certain restrictions, hereinafter called the Potter restrictions, and a covenant on the part of Potter to hold her land subject thereto. The plaintiff accepted these as "the usual Weld restrictions" named in the original memorandum. It is plain that if it had been Weld who had sent this statement of the Potter restrictions to the plaintiff, it would have fixed definitely the contemplated restrictions, and upon their acceptance a final agreement would have been completed. But this copy was sent by Balch to the plaintiff without the actual knowledge of Weld and without any express authority from him; and it is contended by the defendants that he is not bound by it.

The master has found that Weld is bound by this act of Balch, for reasons which are stated in his report. We are of opinion that this finding must be sustained.

There is no dispute that in the beginning of this matter Balch was acting as the agent of Weld, with Weld's knowledge and consent. The letter of October 29 was sent to the plaintiff through Weld himself, who read the letter and acquiesced in it, and adopted it as binding upon himself. It was still, however, Balch's letter, though binding upon Weld. And this letter contained an express promise by Balch, that he, Balch, would send to the plaintiff a copy of "the usual Weld restrictions" if the plaintiff so desired. This was an important part of Balch's letter by which Weld consented to be bound. The plaintiff, accepting this letter as written by Weld's authority, had a right to believe that Balch was authorized by Weld to make this promise, as indeed was the case; and this would include, as to the plaintiff, authority to keep the promise. The copy of the restrictions was not to be sent by Weld personally, or under some subsequent authority to be given or withheld as Weld might choose; it was to be sent by Balch, under authority from Weld then given by Weld's very act in assenting to Balch's promise and allowing himself to become bound thereby.

Accordingly the words "the usual Weld restrictions" in the original memorandum have been fixed and made certain through the subsequent adoption by the parties of the Potter restrictions as the ones intended by the words originally used. We do not

understand it to be now denied that in every other respect a complete agreement had been made. Accordingly we are of opinion that it appears that a final and complete agreement had been reached between the plaintiff and Weld, and that the first ground of defense set up fails the defendants. This view is confirmed by the findings of the master that there was no dispute between the parties as to these restrictions, but that the disagreement was due in the first instance to certain other claims made by Weld.

2. It is a different question whether there was any memorandum of this agreement sufficient to satisfy the provisions of the statute of frauds.

The memorandum of course must state upon its face or by means of other documents to which reference may be had all of the essential terms of the agreement. *Whelan* v. *Sullivan*, 102 Mass. 204. *Doherty* v. *Hill*, 144 Mass. 465, 468. *White* v. *Bigelow*, 154 Mass. 593, 595. *Bogigian* v. *Booklovers Library*, 193 Mass. 444. Looking at this memorandum by itself accordingly, the first question is whether any, and if any, what meaning can be given to the words " the usual Weld restrictions." Oral testimony is competent to show both the situation of the parties and what restrictions, if any, had previously been put by Weld upon other land of his forming a part of the same tract of land or situated in its neighborhood, and also to determine whether any and what definite scheme of restrictions had been formed or framed by Weld, so as in either event to be fairly included within the words used. Such evidence may be received for the purpose of determining the exact subject matter which is spoken of, of applying the language to that subject matter, and thus of ascertaining precisely what was in the minds of the parties and so construing correctly the language they used. *Putnam* v. *Bond*, 100 Mass. 58. *Swett* v. *Shumway*, 102 Mass. 365. *New England Dressed Meat & Wool Co.* v. *Standard Worsted Co.* 165 Mass. 328. *Buffington* v. *McNally*, 192 Mass. 198. *DeFriest* v. *Bradley*, 192 Mass. 346, 352. *Garfield & Proctor Coal Co.* v. *Pennsylvania Coal & Coke Co.* 199 Mass. 22. Such testimony was received by the master; and it now appears that Weld had conveyed several parcels of his land near to the land in question, and had imposed upon the lands thus conveyed

certain restrictions which, while they had many features in common, were not uniform ; and it has not been found that any of them could have been accurately described as "the usual Weld restrictions." But the Potter restrictions, and only the Potter restrictions, did apply to a part of the land in question. It was only they that had been adopted or applied by Weld to any part of this land. And it is somewhat significant that these restrictions were not created by the deed from Weld to Potter. They were created by the agreement already mentioned between Weld and Potter. By this agreement, after reference to the previous deed of the land, Potter covenanted to hold for a fixed period the land which had been so conveyed to her subject to the restrictions stated in the agreement, and Weld covenanted to hold certain land of his own, including a part of that here in question, subject to the same restrictions for the same period. Under these circumstances it well might be claimed that by the phrase used the parties intended the Potter restrictions, which, though mentioned in only one recorded paper, had been adopted by Weld as the ones that were to be enforced upon a part of this tract and were the only ones that had been so adopted.

But however this may be, it seems clear to us that the copy of the Potter agreement which was sent by Balch to the plaintiff is to be taken in connection with his first letter, and that these two papers are to be construed together in determining whether there was a sufficient memorandum of the agreement. Apart from the fact that the Potter agreement was already in existence when Balch's first letter was written, the fact that this copy was sent and may have been prepared after the first letter was written is not material. *Freeland* v. *Ritz*, 154 Mass. 257. Both of these papers must be deemed to have been parts of the same transaction. *Lee* v. *Butler*, 167 Mass. 426. Balch's first letter was written on October 29, 1906, apparently the same day on which the oral agreement was made. The plaintiff immediately asked for a copy of the restrictions, and it seems to have been sent to him at once. The plaintiff then, on October 30, wrote another letter to Balch, reciting his purchase and agreeing to pay the stipulated price. Manifestly the whole correspondence was but one transaction.

The old rule, by which no other paper could be used to help out the memorandum unless incorporated into it by reference in the memorandum itself (*Morton* v. *Dean*, 13 Met. 385, *Boardman* v. *Spooner*, 13 Allen, 353), is no longer followed. The connection between different papers, so that they may be considered together and their sufficiency be determined by the contents of all of them, may be proved by oral evidence, at least so far as it is the result of that evidence to establish the fact that all of the different papers which are so to be considered together were brought to the attention of both parties, and were linked together in their minds, so that the parties themselves may be found to have adopted all the papers as the expression of their purpose. This is the effect of the recent cases. "There is no doubt under the authorities," said the present Chief Justice in *Lee* v. *Butler*, 167 Mass. 426, "that the letter and receipt, as well as the paper containing the promise, may be used to complete the memorandum in writing required by the statute of frauds to make such a contract binding. . . . It is also well settled that parol evidence may be introduced to show the situation of the parties and the circumstances attendant upon the transaction for the purpose of applying the contract to the subject matter, and of showing the connection of different writings constituting the memorandum with one another." This doctrine was applied, with a statement of both the old rule and that now followed, in *Oliver* v. *Hunting*, 44 Ch. D. 205, in which Kekewich, J., uses this language: "It is difficult, perhaps, to say where parol evidence is to stop; but substantially it never stops short of this, that wherever parol evidence is required to connect two written documents together, then that parol evidence is admissible." See *Lerned* v. *Wannemacher*, 9 Allen, 412, 416; *Freeland* v. *Ritz*, 154 Mass. 257; *Hibbard* v. *Hatch Storage Battery Co.* 174 Mass. 296; *Beckwith* v. *Talbot*, 95 U. S. 289; *Cooper* v. *Bay State Gas Co.* 127 Fed. Rep. 482; *Sheers* v. *Thimbleby*, 76 L. T. (N. S.) 709; *Camp* v. *Moreman*, 84 Ky. 635; *Jenkins* v. *Harrison*, 66 Ala. 345; *White* v. *Breen*, 106 Ala. 159; *Strouse* v. *Elting*, 110 Ala. 132; *Brewer* v. *Horst & Lachmund Co.* 127 Cal. 643.

It cannot be contended that the Potter agreement was not signed by Weld, and so is not to be taken against him as a part of the memorandum. *Doherty* v. *Hill*, 144 Mass. 465. In that

case, the deed was prepared by the plaintiff and offered in vain to the defendant for execution; here, the copy was sent to the plaintiff by Weld, acting through Balch. And although the master finds that no writing accompanied the copy, yet the copy must have shown Weld's copied signature, and having been sent by Weld through Balch, as it must now be treated, this was of course enough. It was a statement in writing by Weld of what he intended by the words he had used as to the restrictions, and constitutes a part of the memorandum. It was not a variation or alteration of the former agreement or of the terms stated in Balch's first letter. It was a statement in detail of the restrictions which were described in that first letter. And it was found by the master in his supplementary report that Balch, when he wrote the first letter, intended by the words "the usual Weld restrictions" those which were stated in the Potter agreement, and that it was the understanding of Weld that these were the restrictions to be specified in the deed to be made to the plaintiff, and that the original agreement never was altered by the parties.

Accordingly, we are of opinion that there was here a sufficient memorandum of the agreement to satisfy the requirements of the statute of frauds.

3. The finding of the master that there had been no rescission of the contract cannot be said to have been plainly wrong. The fact that Weld said that he would throw up the contract unless his claims were conceded, and that the plaintiff replied "All right," is not decisive of such a rescission. It might have shown a rescission by mutual consent; but it also might show merely that Weld threatened to repudiate his agreement, and that the plaintiff intimated that Weld could do as he pleased, and in that case he, the plaintiff, would act as he pleased. And the master could find that Weld's remark was not intended as more than a tentative suggestion. Upon all the facts reported, we cannot revise the master's finding upon this issue.

What we have said disposes of all the contentions that were made at the argument before us. The final decree must be modified so as to charge the defendants with the costs of this appeal, and so modified must be

*Affirmed.*