ENERGY RESOURCES CORPORATION, INC. *vs.* JAMES H. PORTER & another.[1]

Middlesex.  April 22, 1982. — August 5, 1982.

Present: BROWN, PERRETTA, & KASS, JJ.

*Corporation*, Officers and agents, Corporate opportunity. *Trade Secret.*

In an action by a science and engineering corporation alleging that a former employee had diverted a corporate opportunity in violation of his fiduciary duty as an officer and chief scientist of the corporation, the employee could not prevail on his claim that another's refusal to deal with the corporation provided a reason for his exploiting the opportunity, where the employee had concealed that refusal, and the reasons for it, from the corporation. [299-302]

In an action by a science and engineering corporation seeking recovery from its former officer and chief scientist for allegedly misappropriating its trade secrets, the judge correctly concluded that the plaintiff's technology and concepts did not constitute trade secrets. [302-303]

CIVIL ACTION commenced in the Superior Court Department on December 11, 1979.

The case was heard by *Donohue*, J.

*Thomas J. Dougherty* for the plaintiff.

*Gordon T. Walker* (*Judith G. Dein* with him) for the defendants.

KASS, J.  From 1976 to 1979, James H. Porter was vice-president and chief scientist of Energy Resources Corporation, Inc. (ERCO).  On October 5, 1979, he resigned and organized Energy & Environmental Engineering, Inc. (EEE).  The first business EEE undertook was a research project, to be done in collaboration with Howard University, for the United States Department of Energy concerning a

---

[1] Energy & Environmental Engineering, Inc.

method of burning high sulfur coal which would produce little air pollution. ERCO complains that Porter diverted a corporate opportunity, violated his employment agreement with ERCO and misappropriated trade secrets. A Superior Court judge sitting without a jury heard the case and entered judgment for the defendants.

We have the benefit of excellent findings of fact by the judge. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). On those findings we rely for the factual setting of the case, with some fleshing out on the basis of undisputed matter in the record.

ERCO is a science and engineering company, located in Cambridge, which provides products and services in energy and environmental fields. Among its areas of investigation was staged fluidized bed combustion of coal. By that process, coal mixed with limestone could be burned so as to capture sulfur as a solid, rather than allowing it to escape into the atmosphere as a gas. To the end of developing a commercially efficient coal-fired furnace which harnessed that process, ERCO operated a fluidized bed combustor pilot plant and a full-scale fluid bed combustor test facility.

Porter had come to ERCO from the Massachusetts Institute of Technology, from which he held a doctoral degree and where he had been an associate professor in the department of chemical engineering. Fluidized bed combustion was a subject to which Porter had given attention at M.I.T. and about which he had written as early as 1963. At ERCO, research and development concerning application of the fluidized bed combustion process was under Porter's general direction. As to royalties earned by ERCO from his inventions, Porter, under his employment agreement, was to receive 18% in addition to his annual salary (which was $52,000 in 1979).

In December, 1977, Porter went to Washington, D.C., to deliver a paper on fluidized bed combustion at a fifth annual meeting on that subject sponsored by the United States Environmental Protection Agency and the Department of Energy (DOE). While in Washington Porter looked up two

colleagues at Howard University, Professors Cannon and Jackson, with whom he had been earlier acquainted. Cannon is chairman of the department of chemical engineering at Howard and Jackson is director of its fossil fuel laboratory.

This encounter led in due course to a joint proposal to DOE by Howard and ERCO for a development grant involving staged fluidized bed combustion of coal. Jackson had told Porter that DOE would be favorably disposed to a proposal from a "minority institution." Howard, traditionally, has a black student body, and Cannon and Jackson are black. So is Porter. Howard was to be the primary applicant and ERCO would be the subcontractor. ERCO's participation was approved by other executives of ERCO. During the first five months of 1979, Cannon, Jackson and Porter worked on the submission to DOE; Porter wrote most of the technical section. The draft proposal listed ERCO as a proposed subcontractor and included biographical information about ERCO personnel, notably, of course, about Porter.

In early May, 1979, during the course of a ride from Washington National Airport to DOE, Jackson advised Porter of a change of heart about working with ERCO. Jackson had become apprehensive that ERCO would claim the entire enterprise as its idea and that because "we are just little black people at a black university everybody was going to believe them." Moreover, Jackson said, he didn't want to be a part of something that might be seen as "blacks serving as sort of fronts for white firms getting minority money." Finally, he thought that in the long run more money would flow from DOE if there were a minority subcontractor in the picture. Porter attempted to persuade Jackson to continue to work with ERCO.

During the conversation at DOE which followed, Jackson broached the subject of dealing with a subcontractor other than ERCO and was told by a DOE official that the key man was Porter, whether he was at ERCO or elsewhere. Cannon and Jackson came up to Cambridge a week

later to see Porter at M.I.T. and suggested that, if he were to form his own company, they would be pleased to substitute it for ERCO in the proposal to DOE. Porter agreed to do so. Cannon and Jackson deleted references to ERCO and substituted EEE, a corporation to be formed by Porter. Thereafter, although he continued to work at ERCO, Porter cut himself off from the Howard submission to DOE. "I knew I was in a ticklish position, sought advice of counsel and decided it best I just not do anything on that proposal."

About three weeks later, Richard H. Rosen, the president of ERCO, Robert S. Davis, an executive vice-president, and Porter met for a routine review of pending ERCO projects. At that meeting Rosen asked Porter, "How about the Howard proposal?" Porter responded, "We're not going to get that." Rosen and Davis made no further inquiry and went on to the next item of business. Davis asked Porter about the Howard proposal on a later occasion and, once again, was told, without further elaboration, that ERCO wasn't going to get a subcontract from Howard.

Toward the end of September or the beginning of October, 1979, DOE awarded a grant to Howard and on or about October 5, 1979, Porter resigned his offices at ERCO on one day's notice. He told Davis and Rosen that his reason for leaving was to organize a corporation which would work in the area of computerized cars. Rosen, still unaware of Porter's participation in the Howard project, hired Porter as an independent consultant to ERCO for a period of sixty days.

1. *The corporate opportunity.* None of the parties debates that exploitation of the fluidized bed combustion process was squarely within ERCO's corporate activity and that, without more, an officer of ERCO had a fiduciary duty not to divert that opportunity for his own benefit. See *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. 187, 198-199 (1948); *BBF, Inc.* v. *Germanium Power Devices Corp.*, 13 Mass. App. Ct. 166, 172 (1982), and cases cited. Indeed, Porter used his time as an employee of ERCO and the time of other employees of ERCO, as well as certain graphics,

in preparing a draft of the submission to DOE which ultimately reeled in a grant. Contrast *Lincoln Stores, Inc.* v. *Grant,* 309 Mass. 417, 421-422 (1941); *Black* v. *Parker Mfg. Co.,* 329 Mass. 105, 112-113 (1952).

Porter's defense is that the staged fluidized bed combustion project with Howard ceased being a corporate opportunity for ERCO when Jackson refused to deal with ERCO. When a corporation is unable to avail itself of an opportunity, its employee, officer or director is free to exploit it. *Miller* v. *Miller,* 301 Minn. 207, 225 (1974). 3 Fletcher, Cyclopedia of the Law of Private Corporations § 862.1 (rev. perm. ed. 1975).[2] It was a defense which the trial judge thought convincing: "[N]o amount of persuasion," he wrote, "could alter Dr. Jackson's resolve that the subcontractor be a minority concern." Porter was not to be asked for "performance of fiduciary duty even to the point of futility." The difficulty with the judge's reasoning is that the unalterability of Jackson's resolve can by no means be certain so long as Porter, by keeping Jackson's position and his reasons for it a secret, never afforded ERCO a chance to test it. Had Porter told ERCO about Howard University's desire (as manifested by Jackson) to deal with a subcontractor controlled by persons who were black, the matter might have taken a variety of turns. Other officers of ERCO might have persuaded Jackson and Cannon — or others at Howard — that the status of Porter with ERCO was such that their unease about ERCO was not warranted. It might have been possible to organize a corporation in which Porter had a majority position and ERCO had a minority position. These are but two of many possibilities.

For the reason that the firmness of a refusal to deal cannot be adequately tested by the corporate executive alone, it has not been favored as a defense unless the refusal has first been disclosed to the corporation. Without full disclosure it is too difficult to verify the unwillingness to deal and too

---

[2] The inability asserted is often a lack of financial capacity by the corporation. See, e.g., *Durfee* v. *Durfee & Canning, Inc.,* 323 Mass. at 202.

easy for the executive to induce the unwillingness. Note, Corporate Opportunity, 74 Harv.L.Rev. 765, 773 (1961). See Brudney & Clark, A New Look at Corporate Opportunities, 94 Harv.L.Rev. 997, 1021 (1981). If the refusal to deal is shrouded in secrecy, it is too likely that the tempted officer will find himself in the position of Fielding's "fair creature" of whom he wrote, "[He] would have ravished her, if she had not, by a timely compliance, prevented him."[3]

Although the defense of a refusal to deal has not been squarely confronted in Massachusetts cases, similar defenses of corporate inability to exploit an opportunity have had a cool reception. In *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. at 200-202, the credit weakness of the corporation did not permit Canning, who was a director and principal officer, to turn to his own account the purchase of gasoline which would have been advantageous to the corporation. *Production Mach. Co.* v. *Howe*, 327 Mass. 372, 375-378 (1951), required disclosure of the availability of a line of business that, although new to the corporation, was within its manufacturing capacity. "Breach of the duty [to protect the interests of the corporation] could be found although no corruption, dishonesty, or bad faith was involved." *Id.* at 378. In *Cain* v. *Cain*, 3 Mass. App. Ct. 467, 476-477 (1975), we required the defendant to inform the corporation of which he was a director and treasurer that the loss of certain business was imminent.

A case closer on its facts to that at bar was *Kelly* v. *74 & 76 W. Tremont Ave. Corp.*, 4 Misc. 2d 533 (N.Y. Sup. Ct. 1956), in which the executive, defending a diversion of a corporate opportunity, claimed that the seller would not have sold certain controlling stock to his corporation at the same price available to him. Commenting that, at the least, the executive was required to make full and frank disclosure of this refusal to deal, the court wrote: "If Jameson [the seller], in no event, would change his mind, and Gold-

---

[3] Fielding, Jonathan Wild 102 (Everyman's Library ed. 1964).

stein [the buyer] made full disclosure, there would have been time enough to have permitted Goldstein's purchase of the stock for himself and his favored colleagues." *Id.* at 537. See also *Patient Care Servs., S.C.* v. *Segal*, 32 Ill. App. 3d 1021, 1031 (1975); *Ellzey* v. *Fyr-Pruf, Inc.*, 376 So.2d 1328 (Miss. 1979). We conclude that before a person invokes refusal to deal as a reason for diverting a corporate opportunity he must unambiguously disclose that refusal to the corporation to which he owes a duty, together with a fair statement of the reasons for that refusal. Porter's statement, "We're not going to get that," fell far short of that standard. Indeed, Porter went beyond nondisclosure. He acted secretively and even on the occasion of his departure from ERCO masked his true reason for leaving.

2. *Misappropriation of trade secrets.* It might be thought that the questions of misappropriation of trade secrets are subsumed in the corporate opportunity question; that is, whatever damages flow from diversion of the corporate opportunity would be the same as from misappropriation of trade secrets concerning staged fluidized bed combustion, if there were any. Upon closer examination, the diversion of the corporate opportunity related not to fluidized bed combustion but to joining with Howard to obtain a development grant for the process. The misappropriation question retains significance.

The trial judge found that: "fluidized bed technology and concepts have been common knowledge in the professional and scientific community for a number of years; . . . that staged or multi-staged fluidized beds have been in existence for at least [twenty] years and are illustrated and discussed in technical literature . . .;" and that such nuances as ERCO had developed through Porter's work had not been closely guarded. There was support in the record for these findings and we are far from a conviction that a mistake has been made. *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977). On the basis of these findings the judge correctly ruled that Porter was not to be broadly restrained from putting to use the product of his

general knowledge, experience and skill in the fluidized bed combustion field. *J. T. Healy & Son* v. *James A. Murphy & Son*, 357 Mass. 728, 736 (1970). *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. 835, 840 (1972). *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 165 (1979). *Chomerics, Inc.* v. *Ehrreich*, 12 Mass. App. Ct. 1, 6 (1981). See also *Manos* v. *Melton*, 358 Mich. 500 (1960), a case close on its facts to that at bar.

3. *Other issues.* Whether Porter was in breach of his employment agreement is subsumed in the resolution of the previous issues, i.e., the diversion of the corporate opportunity is perforce a breach of a provision in the employment agreement that the employee will "diligently perform all duties of his . . . employment and . . . devote his full time, skill, energy and ability for the promotion of the business of the Company." The same damage results, whether seen as flowing from violation of Porter's fiduciary duty or violation of the agreement. Since no misappropriation of trade secrets was found, Porter cannot be in breach of that portion of the agreement which required him not to divulge confidential information.

ERCO's claim under G. L. c. 93A is governed by *Newton* v. *Moffie*, 13 Mass. App. Ct. 462, 469 (1982), and is, therefore, without merit.

The judgment is reversed and the case is remanded to the Superior Court for assessment of damages based on a computation of EEE's net profits from the DOE grant. The court should disallow as deductions from EEE's gross profits fees and expenses incident to the DOE project which ERCO would not have had to incur, and distributions to Porter in excess of $52,000 per year. Nondeductible expenses shall include, but shall not be limited to, EEE's legal fees in connection with its incorporation and this litigation.

*So ordered.*

BROWN, J. (concurring). I continue to be amazed at the role often played by counsel in circumstances such as here

presented.   It appears that the advice given[1] was either un-
wise or of questionable competence, or both, especially if
one has in mind that the client has stated on the record that
"I knew I was in a ticklish position, [and] sought advice of
counsel."   When lawyers have the opportunity to keep their
clients at least at the moral level of the market place, they
have a public duty to avail themselves of it.   After a great
deal of court time and massive legal fees, this court has now
stated what should have been obvious at the outset:   a
fiduciary's silence is equivalent to a stranger's lie.

---

[1] Counsel of record on appeal was not involved in this matter prior to
the commencement of the litigation.