ROBERT B. HUNT & another[1] vs. HARRY F. RICE & another,
executors.[2]

No. 87-309.

Norfolk. December 9, 1987. — April 15, 1988.

Present: BROWN, KAPLAN, & KASS, JJ.

*Contract*, What constitutes, Sale of real estate, Under seal, Delivery. *Real
Property*, Sale. *Frauds, Statute of. Evidence*, Relevancy and materiality.
*Practice, Civil*, Findings by judge.

Where a decedent's executors had invited sealed bids for the purchase of cer-
tain real property of the estate on terms such that any bid received would
constitute an offer which the executors would be at liberty to accept or
reject, and the executors had stated that all bids would be considered at
the time appointed for the bid opening, acceptance of the highest bid
was manifested by evidence that, at the opening, one of the executors,
choosing not to consider the bids further, pronounced the highest bid
the winner and thereafter deposited the highest bidders' deposit in a
bank and returned the other bidders' deposits and papers to them, where,
in the circumstances, the precise terms of the sale were never in doubt
and where, in addition, both executors later signed the purchase and
sale agreement submitted by the highest bidder. [627-629] BROWN, J.,
concurring.

Language in an invitation for sealed bids for the purchase of certain real prop-
erty, which contemplated signature and delivery of a purchase and sale
agreement, described, in the circumstances, a mere formality and did
not establish delivery of the agreement as a condition precedent to the
sellers' binding acceptance of the highest bid. [629-630] BROWN, J.,
concurring.

Language in a form of purchase and sale agreement which accompanied an
invitation for sealed bids from prospective purchasers of certain real
property, stating that the agreement was "to take effect as a sealed
instrument," did not make delivery of the agreement a condition prece-
dent to the sellers' binding acceptance of the highest bid, where the
successful bidders' rights did not depend on the "sealed" character of

[1] Katherine L. Hunt.
[2] Lloyd B. Waring.

the signed agreement, but, rather, rested upon their offer and deposit and the sellers' acceptance of both. [630-631] BROWN, J., concurring.

The requirements of the Statute of Frauds, as applicable to sellers' acceptance of prospective buyers' sealed bid for the purchase of certain real estate, were satisfied by the sellers' endorsements on the buyers' deposit checks, when considered with the other bid papers, and, additionally, were satisfied by the sellers' signatures on a fully executed, but undelivered, purchase and sale agreement. [631-633] BROWN, J., concurring.

Where a decedent's two executors had invited sealed bids for the purchase of certain real property of the estate, the absence of one of the executors from the opening of the bids was without significance, where that executor, by later signing a purchase and sale agreement, ratified his coexecutor's acceptance of the successful bid. [633] BROWN, J., concurring.

At the trial of an action seeking conveyance of certain real property, a letter from the plaintiffs' counsel, purporting to show that after litigation was commenced the plaintiffs had offered to pay the defendants an additional $25,000 for the property was properly excluded from the evidence as an offer to compromise the litigation. [633] BROWN, J., concurring.

A judge's findings in a civil action bore sufficient indicia of his exercise of independent judgment, although the findings followed closely the sequence, text, and references to authority contained in suggested findings submitted by counsel for the prevailing parties. [633-634] BROWN, J., concurring.

CIVIL ACTION commenced in the Superior Court Department on December 21, 1984.

The case was heard by *Edward W. Farrell*, J., sitting under statutory authority.

*Richard W. Renehan* (*Bruce E. Falby, William F. Kehoe, Stanley H. Rudman & Dana F. Rodin* with him) for the defendants.

*John D. Donovan, Jr.* (*R. K. Gad, III*, with him) for the plaintiffs.

KASS, J. Among the assets left by Amelia Peabody upon her death was a choice forty-acre property, "Mill Farm," in Dover. Her executors elected to sell it by inviting sealed bids from interested parties whom the executors had previously approved. Robert B. and Katherine L. Hunt submitted the highest sealed bid. The question before us is whether the executors' response to the Hunt bid produced an enforceable contract. We hold that it did and affirm the judgment below.

Before inviting bids, the executors had the property appraised. On the basis of that appraisal, the detailed bid kits which the executors sent out established a minimum price of $975,000. Included in the kits were: the form of purchase and sale agreement to be executed; the form of deed which would be delivered (it spelled out significant easements and a conservation restriction to which the land was subject); an escrow agreement; a map of the premises; and a letter of instructions to the prospective bidders.

What was required of a bidder was simple and precise. A bidder needed to: (1) fill in the name and address of the party designated "Buyer" in paragraph 1 of both copies of the purchase and sale agreement in the bid kit (the proffered agreement was on a 1978 edition of a form published by the Greater Boston Real Estate Board); (2) fill in the price bid, the ten percent deposit on that price, and the balance to be paid at closing; and (3) sign both copies of the agreement in the spaces designated for Buyer in the signature block. Finally, a bidder was to deliver the completed agreements with a certified check for the deposit no later than 1:00 P.M., November 30, 1984, at the office of the executors of the will, Harry F. Rice and Lloyd B. Waring.

The Hunts executed the prescribed dance step faithfully. Their bid was $1,200,000. Lesser bids of $1,180,000 and $1,176,000 were tendered by others. Rice, who pulled the laboring oar for the executors so far as real property of the estate was concerned, received the sealed bids in an outer office and retired with his lawyer to an inner chamber to examine them. Waring, the coexecutor, was elsewhere.

Concerning the manner in which the executors proposed to deal with bids, the invitation to bid had the following to say:

"The sealed bids will be opened at 1:00 P.M. on November 30th [1984]. At that time, all bids will be considered but we reserve the right to reject any and all offers and to conduct further negotiations after offers have been received with any Offeror, without the necessity of further notice to other Offerors and to accept any offer

which, in our sole judgment, we deem to be in the best interests of the Estate, whether or not such offer is in the highest dollar amount.

If an offer is acceptable to us, both copies of the Purchase and Sale Agreement will be executed by us and one such fully executed copy will be mailed or delivered to the successful bidder no later than Tuesday, December 4, 1984.

The bids and certified deposit checks of all unsuccessful bidders will be mailed or returned to them on Tuesday, December 4, 1984."

After some twenty minutes, Rice and his lawyer emerged and Rice, turning to Mrs. Hunt, said: "Congratulations, you've bought the farm."[3] To the rest of the persons in the room, Rice pronounced, "Mrs. Hunt is the high bidder with a bid of $1.2 million." Jean and Nicholas Vinios, disappointed bidders (they were the lowest of the three), gallantly congratulated Mrs. Hunt. Rice returned to the Vinioses their bid package, including their certified check. By messenger, Rice returned to a third bidder his bid kit, including deposit check. Gesturing with the Hunt papers, Rice said, "I have to keep this." He retained, promptly endorsed, and deposited the Hunts' certified deposit checks (there were two checks, totalling $120,000) to the account of the estate of Amelia Peabody.

In further conversation with Mrs. Hunt, Rice suggested an appointment to discuss the purchase of personal property on Mill Farm (agricultural machinery, tools, and furnishings). To that end, later in the afternoon of the bid opening, Rice notified the housekeeper at the Mill Farm that the Hunts had been the successful bidders.

November 30, 1984, the bid opening day, was a Friday. On the following Monday, Rice, at his office, affixed his signature

---

[3] We do not know if irony was intended. The phrase "bought the farm," is slang for death, usually accidental. Roots of the expression are variously traced to military and early aviation usage. See Morris, Morris Dictionary of Word & Phrase Origins 80 (1977); Chapman, New Dictionary of American Slang 57 (1986).

on one of the two signed counterparts of the purchase and sale agreement which the Hunts had tendered with their bid. Rice then passed the document to his coexecutor, Waring, who also signed it. With an appended note that said, "For Buyers," Rice delivered the executed copy to counsel for a last review and, thereafter, delivery to the Hunts. Monday was December 3d, and delivery of an executed copy "to the successful bidder" had been promised for December 4th in the invitation to bid.

Later on December 3, 1984, Rice received a letter from new counsel[4] for the Vinioses addressed to the executors. Enclosed with the letter were purchase and sale agreements conforming to the bid kit model and signed by the Vinioses. The price filled in on the agreement was $1,225,000, thus raising the previous Vinios bid by $49,000, and offering to trump the Hunt bid by $25,000. Certified checks for the required deposit were included. The accompanying transmittal letter said: "Mr. Vinios does not feel that the bidding procedures were such as to assure that the best interests of the estate would be advanced."

The executors and their counsel huddled. Rather than delivering an executed purchase and sale agreement, the executors' counsel delivered a letter stating that, "The Executors . . . have rejected all bids on the subject property. The Executors will be in touch with you before long with regard to the sale of Mill Farm." The letter attempted to return the Hunts' deposit, a tender which they rejected. Rather, the Hunts brought an action for declaratory relief and specific performance. The appeal is from a judgment declaring that the executors are legally bound to convey Mill Farm to the Hunts and ordering the executors to do so.[5]

---

[4] The lawyer who had counseled the Vinioses about making a bid and had accompanied them to the bid opening withdrew because of a potential conflict of interest.

[5] In the meantime (on April 12, 1985) the executors have conveyed the Mill Farm to the Vinioses for a price of $1,300,000, subject to an agreement which requires the Vinioses to assume the burden of the litigation with the Hunts and to disgorge the property to the Hunts, should they prevail, for a price of $1,200,000 and otherwise in accordance with the agreement which the Hunts had signed.

1. *Manifestation of acceptance*. It is possible to conduct an auction sale "without reserve," i.e., to declare that the property up for sale shall go to the highest bidder. The terms of sale in such a case will have been published and the only variable for the seller to consider is the amount of the bid. See *Curtis* v. *Aspinwall*, 114 Mass. 187, 191-192 (1873); *Weinstein* v. *Green*, 347 Mass. 580, 582 (1964); Restatement (Second) of Contracts § 28(1)(b) (1979); 1 Williston, Contracts § 29 (3d ed. 1957). That, however, is not the auction method which the executors chose in this case. They elected to invite bids, each of which would constitute an offer which the executors, as sellers, were at liberty to accept or reject. *Weinstein* v. *Green*, 347 Mass. at 582. Restatement (Second) of Contracts § 28(1)(a) (1979). See 1 Corbin, Contracts § 24 (1963). By reserving the right to reject any and all offers, the executors did no more than make express what the structure of their invitation to bid signified as matter of law, that they were conducting an auction "with reserve." See Restatement (Second) of Contracts § 28 comment b (1979). Each of the bidders and the seller were entitled to withdraw until the seller signified acceptance of a bid. See *Outpost Cafe, Inc.* v. *Fairhaven Sav. Bank*, 3 Mass. App. Ct. 1, 3 (1975); 1 Corbin, Contracts § 108 (1963). See also G. L. c. 106, § 2-328.

The trial judge correctly concluded that the executors manifested their acceptance of the Hunt offer at the bid opening and reinforced their manifestations of acceptance thereafter. Acceptance may be manifested by conduct or words, or a combination of the two which are reasonable in the circumstances. Restatement (Second) of Contracts § 30 (1979). Farnsworth, Contracts § 3.13 (1982). See also G. L. c. 106, §§ 2-204 and 2-206. The content of the conduct or words should include: (1) an expression of commitment; (2) which is unconditional, i.e., does not vary the terms of the offer; and (3) which is not conditioned on a further step. Farnsworth, *supra*. What we examine are the parties' overt acts. See *Hotchkiss* v. *National City Bank*, 200 F. 287, 293 (S.D. N.Y. 1911) (L. Hand, J.), affd., 201 F. 664 (2d Cir. 1912), affd., 231 U.S. 50 (1913); Holmes, The Common Law 307 (1881).

There was no absence of expression of commitment. By the terms of their invitation for bids, the executors had declared that offers would be considered at the time of the opening.[6] Rice did so. To be sure, the executors had reserved the right to reject all the bids or to embark on a course of negotiations with any of the three offerors. That Rice did *not* do. He did not, upon returning from his perusal of the bids, announce that they would be further considered or that the executors would negotiate with one of the offerors. Rather he pronounced the Hunts as the winners. "Congratulations, you've bought the farm."[7] In addition he banked the Hunts' deposit, suggested to Mrs. Hunt that she might want to buy equipment and furnishings, and, pointedly, returned to the other bidders their papers and deposit checks.

As to the terms of the purchase, there was no doubt or attempt to vary. Those terms had been spelled out in meticulous detail by the sellers. All the offeror had to do was name the price. See *Conway Sav. Bank* v. *Vinick*, 287 Mass. 448, 453 (1934). Compare those cases recently reviewed in *Goren* v. *Royal Invs., Inc.*, *ante* 137 (1987), and *Blomendale* v. *Imbrescia*, *ante* 144 (1987), in which the terms of sale were uncertain.

That the executors countersigned a counterpart of the purchase and sale agreement submitted by the Hunts is evidence that Rice and Waring themselves considered that the deal with the Hunts had been made. The act of signing the agreements, under the terms of invitation for bids, was to be taken by the executors after they had determined that "an offer is acceptable to us." Once the executors had by speech and conduct manifested their acceptance of the Hunt offer, they could not thereafter reject it, nor could the Hunts withdraw their offer. See *Samincorp So. Am. Minerals & Merchandise Corp.* v. *Lewis*, 337 Mass. 298, 302 (1958).[8] Contrast cases in which specified

---

[6] "At that time, all bids will be considered. . . ."

[7] Rice did not recall saying that, but the trial judge found that he did and there was evidence to support the finding. There is no dispute by Rice that he announced the Hunts as the high and successful bidders.

[8] In their briefs, the parties engage in a lively debate as to who controlled the mode of acceptance of the Hunts' offer. See *David J. Tierney, Jr., Inc.* v.

terms of acceptance were not met or expressed conditions necessary to acceptance did not materialize: *Callanan* v. *Chapin*, 158 Mass. 113, 119-120 (1893); *Diebold Safe & Lock Co.* v. *Morse*, 226 Mass. 342, 344 (1917), *S.C.*, 234 Mass. 17 (1919); *Taylor* v. *Haverhill*, 316 Mass. 380, 382 (1944); *Kerwin* v. *Donaghy*, 317 Mass. 559, 568 n.2 (1945); *Howland* v. *Plymouth*, 319 Mass. 321, 324 (1946).

2. *Requirement of delivery of the written contract.* Did the executors' bid instructions condition acceptance of a responsive bid on a defined further step? The executors urge that the language of the invitation for bids establishes delivery of a signed agreement as the decisive act to make a contract. To lapse into the argot of the law, the executors claim to have set up delivery as a condition precedent to a binding acceptance.

It will be recalled that the bid kit provided, "If an offer is acceptable to us, both copies of the Purchase and Sale Agreement will be executed by us and one such fully executed copy will be mailed or delivered to the successful bidder no later than Tuesday, December 4, 1984." The quoted language has the ring of administrative follow-up rather than condition precedent. One would expect a condition precedent to be expressed with more precision, particularly within so precise a document. A condition precedent might be expressed, for example by: "No bid is to be regarded as accepted, and we shall not be bound to any bidder, until we have delivered a fully executed purchase and sale agreement to the successful bidder."

Our opinion that the clause upon which the executors rely was a timetable guideline, not a contract term, finds support in the sentence which immediately follows it, which reads: "The bids and certified deposit checks of all unsuccessful bidders will be mailed or returned to them on Tuesday, December 4, 1984." The executors, in fact, returned checks and papers to the lower bidders immediately after the bid opening, i.e., on November 30th, demonstrating that they regarded date points for paper handling as something less than of the essence.

---

*T. Wellington Carpets, Inc.,* 8 Mass. App. Ct. 237, 240 (1979). In the context of the case, it is a sterile controversy, as the executors' objective manifestations of acceptance are decisive.

If, as a number of cases hold, agreement may so mature that execution of a formal instrument is only ceremonial,[9] the language concerning delivery of the executed agreements in the bid document is properly read, in the absence of express language to the contrary, as describing a formality.

When, as here, a written contract is in the picture, the executors urge that commerce and the legal system would be better served by embracing delivery of the written contract as a "bright line" test for contract formation. Undeniably, stitching together a contract on the basis of conflicting testimony and scraps of memoranda is second best to delivery of an executed, integrated written instrument. It is, however, an exercise in which courts are frequently obliged to engage. Imposition of a bright line on ragged commercial facts often does not illuminate, but distorts, what the parties have done. If bright lines are to be applied in a context such as this, the drafters of the instrument must first paint them.

Further to the delivery issue, the executors invoke the rule that a contract under seal must be delivered to be effective. See Restatement (Second) of Contracts § 95 (1979); 1 Williston, Contracts § 206 (3d ed. 1957); 1A Corbin, Contracts § 244 (1963). Whatever the continuing vitality of that rule,[10] it has applied in circumstances where there was reliance on the sealed character of an instrument to effect a contract because consideration had not moved from one party to another. Contrast *Blanchard* v. *Blackstone*, 102 Mass. 343, 347 (1869) (when seals have no effect on an agreement they may be disregarded); *Adamowicz* v. *Iwanicki*, 286 Mass. 453, 456-457 (1934) (where there was sufficient consideration for the agree-

---

[9] See *Coan* v. *Holbrook*, 327 Mass. 221, 224 (1951); *Sands* v. *Arruda*, 359 Mass. 591, 596 (1971); *Bridge Enterprises, Inc.* v. *Futurity Thread Co.*, 2 Mass. App. Ct. 243, 248 (1974); *David J. Tierney, Jr., Inc.* v. *T. Wellington Carpets, Inc.*, 8 Mass. App. Ct. 237, 241 (1979); *Cataldo* v. *Zuckerman*, 20 Mass. App. Ct. 731, 737 (1985); *Goren* v. *Royal Invs., Inc.*, ante 137, 141-142 (1987); *Rand-Whitney Packaging Corp.* v. *Robertson Group, Inc.*, 651 F. Supp. 520, 535-537 (D. Mass. 1986).

[10] As to the erosion of the significance of the seal, see *Nalbandian* v. *Hanson Restaurant & Lounge, Inc.*, 369 Mass. 150, 154-157 (1975).

ment, the seal was unnecessary and the rights of the parties did not depend on the fact that the contract was under seal); *Stern* v. *Lieberman*, 307 Mass. 77, 79 (1940) (a seal may be disregarded where the substantive rights of the parties are not impaired); *Johnson-Foster Co.* v. *D'Amore Constr. Co.*, 314 Mass. 416, 421 (1943) (where there was ample consideration, seal may be treated as surplusage). If, in the absence of consideration or reliance, one looked solely to the ritualistic force of the seal to claim contractual rights, then it might not be unreasonable that the talismanic paper should be delivered into the hands of the person who purported to have rights under it.

Although the form of purchase and sale agreement in the bid kit was, by its terms, "to take effect as a sealed instrument," the Hunts were not depending on that characteristic to assert contractual rights. They were resting on their offer and deposit, and the acceptance of both.

Below the surface of the various points which the executors advance in favor of delivery of a signed contract as the necessary event is the idea that they require running room to assure that they, as executors, obtain the highest price for estate property. See *Forester* v. *O'Connell & Lee Mfg. Co.*, 328 Mass. 377, 380 (1952); *Onanian* v. *Leggat*, 2 Mass. App. Ct. 623, 625 (1974); Newhall, Settlement of Estates § 120 (4th ed. 1958). That duty, as the *Onanian* case calls to attention at 625-626, does not absolve fiduciaries from adherence to usual contract standards in relation to third parties. When, as here, the executors have arranged for a sealed bid auction, starting with a minimum price based on professional appraisal, it is scarcely to be thought that they have not acted to the advantage of the estate when they accept the highest sealed bid.

3. *Statute of Frauds*. However much they may have manifested acceptance of the Hunt offer, the executors argue that their words and conduct were without legal consequence because of the Statute of Frauds (G. L. c. 259, § 1, Fourth); i.e., their acceptance was not enshrined in a written memorandum signed by the party to be charged. The executors fudge the distinction between the contract — here made by the sellers by speech and action in response to the buyers' written submis-

sion — and the memorandum required to prove what the contract is. *Jacobson* v. *Perman*, 238 Mass. 445, 448-449 (1921). *A.B.C. Auto Parts, Inc.* v. *Moran*, 359 Mass. 327, 330 (1971). See *Michelson* v. *Sherman*, 310 Mass. 774, 777 (1942). Two documents constituted evidence of the contract. *First*, there were the deposit checks which the executors had endorsed. See *A.B.C. Auto Parts, Inc.* v. *Moran*, 359 Mass. at 329. Read with the bid papers, the endorsed checks spelled out all the elements of the transaction. *Nickerson* v. *Weld*, 204 Mass. 346, 356 (1910). *Second*, the fully executed purchase and sale agreement which the executors had signed, but not delivered, was received in evidence. It, too, described the transaction in full detail. Only a new closing date needed to be supplied by the court, the closing date set in the agreement (January 25, 1985) having passed by as the Hunts and the executors dug into their respective positions.

Faced with the awkward circumstance of the written purchase and sale agreement signed by both parties, the executors again raise the point that they never delivered it to the Hunts. Hence, the executors contend, the agreement cannot be used to satisfy the Statute of Frauds. Their argument side-steps the evidentiary purpose of the Statute of Frauds. The statute presupposes the existence of a contract, *A.B.C. Auto Parts, Inc.* v. *Moran*, 359 Mass. at 330, and to achieve the objective of proving what the terms of that contract were it is not necessary that the revealing writing make its way into the hands of the claiming party. Indeed, a writing found in the custody of a disinterested third party or remaining with the party to be charged may be more probative. Neither would be likely to counterfeit a document to the claiming party's advantage. See 4 Williston, Contracts § 579A, at 121-122 (3d ed. 1961); 2 Corbin, Contracts § 510 (1950). Contrast cases which have spoken of the necessity of delivery of written instruments when delivery of a document was required by the terms of the oral contract or the document was an instrument of conveyance, such as a deed: *Callanan* v. *Chapin*, 158 Mass. at 119-120; *Mentzer* v. *Hudson Sav. Bank*, 197 Mass. 325, 331 (1908); *Diebold Safe & Lock Co.* v. *Morse*, 226 Mass. at 344; *Reed* v. *Home Ins. Co.*, 295

Mass. 517, 518-519 (1936); *Silbert* v. *Equitable Life Assur. Soc.*, 314 Mass. 406, 408-410 (1943); *Frankowich* v. *Szczuka*, 321 Mass. 75, 77 (1947); *Eckstrom* v. *Eckstrom*, 327 Mass. 140, 142-143 (1951).

4. *Ratification of Rice's action.* Generally, multiple fiduciaries must act together in major decisions. Newhall, Settlement of Estates § 60 (4th ed. 1958). See *Talbot* v. *Bush*, 251 Mass. 27, 29 (1925). So far as appears from the record, Rice and Waring acted jointly in deciding upon the best method for selling Mill Farm, having the property appraised, and formulating the terms of the invitation for bids. The terms of bidding having been carefully established, presiding over the bid opening was a ministerial task which one executor might reasonably assign to the other. In any event, the question of the actual or apparent authority of Rice to act on behalf of himself and Waring at the bid opening was rendered academic by the finding of the judge that Waring had ratified Rice's entering into a contract with the Hunts for the purchase of Mill Farm. The evidence which supported that finding was Waring's signing of the purchase and sale agreement. See *Lenfest* v. *Boston & Me. Corp.*, 537 F. Supp. 324, 334 (D. Mass. 1982); Restatement (Second) of Agency § 84(1) (1957).

5. *Exclusion of higher offer.* No error attended the exclusion of a letter from the Hunts' counsel, proffered by the executors, purporting to show that after litigation began, the Hunts had offered to raise their bid by $25,000. The executors offered the evidence to show that the Hunts could have availed themselves of the opportunity to increase their bid or participate in a new auction of the Mill Farm. That, the executors argue, bears on the Hunts' entitlement to the extraordinary equitable remedy of specific performance by rebutting the impression that the executors were freezing the Hunts out. The letter in question was an offer to compromise the litigation. As such it was properly excluded. See Liacos, Massachusetts Evidence 277-278 (5th ed. 1981); Proposed Mass.R.Evid. 408.

6. *Findings.* The judge's findings closely follow the sequence, text, and references to authority contained in suggested findings submitted by counsel for the Hunts. As may be expec-

ted, the executors protest that there has been a default of independent judicial fact finding, citing *Cormier* v. *Carty,* 381 Mass. 234, 236-237 (1980), and its progeny. Our examination shows sufficient deletions from, additions to, and editing of the offered findings to assure us that the judge applied his independent judgment. We reviewed the ground recently in *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp., ante* 302, 314-315 (1988).

*Judgment affirmed.*

BROWN, J. (concurring). I join fully in the result reached by the majority. It is the conduct of the attorneys in the opening phase of this saga, i.e., those who counseled the executors to reject the Hunts' bid and those who first encouraged the Vinioses to attack the outcome of the auction[1] which, once again, compels me to comment. Cf. *Energy Resources Corp.* v. *Porter,* 14 Mass. App. Ct. 296, 303-304 (1982); *Kennedy* v. *Kennedy,* 20 Mass. App. Ct. 559, 564-565 (1985); *Petitions of Catholic Charitable Bureau to Dispense with Consent to Adoption,* 22 Mass. App. Ct. 48, 60-61 (1986); *Pinkowitz* v. *Edinburg,* 22 Mass. App. Ct. 180, 191 (1986); *Edinburg* v. *Massachusetts Mut. Life Ins. Co.,* 22 Mass. App. Ct. 923, 925-926 (1986).

This case presents a question of offer and acceptance, a subject covered comprehensively in the first-year contracts course in every law school. The correct answer — that the Hunts' offer was accepted by the executors twenty minutes after they examined the bids — should likewise be apparent to every first-year law student.

The executors' decision to sell the real estate at auction "with reserve" was eminently sensible; the bid kits were intelligently prepared; all of the bids were submitted in accordance with the instructions; after opening the bids, the executors announced that the high bidders had (literally) "bought the farm." That should have been the last chapter of this story.[2]

---

[1] None of the lawyers named in the heading to the court's opinion participated in the giving of that advice and my criticism is not directed against any of them.

[2] In descriptive vernacular, the agreement was "bullet-proof."

But, instead, a few days later new counsel for one of the unsuccessful bidders (the Vinioses) attempted to undo the result,[3] and, by that attempt, caused the executors (and their respective counsel) to doubt the soundness of their course of conduct.[4]

The best advice for counsel to have given the Vinioses would have been for them to do nothing. See S.J.C. Rule 3:07, Canon 1, DR 1-102(A)(5), 382 Mass. 770 (1981). And the best advice for counsel to have given the executors, when faced with the Vinioses' late counteroffer, would have been for them (the executors) to do what was minimally honorable — play by the rules of their game. But, as happens all too often when phalanxes of attorneys become involved, improvident advice bred the instant lawsuit, which in turn bred the appeal now before us. This matter has consumed a great deal of court time (at two levels) and, no doubt, has caused the parties to spend a massive amount on legal fees. Compare *Energy Resources Corp.* v. *Porter,* 14 Mass. App. Ct. at 304. After all that, this court now pronounces, as did the executors to the Hunts some forty months ago: "Congratulations, you've bought the farm." [5]

I think double costs of the appeal and substantial counsel fees are certainly warranted here. See *Farm Constr. Serv., Inc.* v. *Robinson,* 21 Mass. App. Ct. 955, 956 (1986), and cases cited. The Hunts and their attorneys acted responsibly and should not be penalized.

In fairness, I should mention that counsel for the executors do merit slight commendation for requiring the Vinioses to assume the burden of this litigation, thereby conserving the

---

[3] I pass over the question whether the Vinioses have standing to assert " 'the best interests of the estate' " (see the majority opinion, *ante* at 626).

[4] It is my view that in these circumstances, nothing in *Onanian* v. *Leggat,* 2 Mass. App. Ct. 623 (1974), provides justification for such a reversal of position.

[5] It is no small irony that the executors' decision to rescind their acceptance of the Hunts' offer, and eventually to sell the farm to the Vinioses subject to the outcome of this litigation (see the majority opinion at note 5, *supra*), might actually have benefited the estate. One wonders, however, how much of that additional $100,000 may have been offset by additional legal or executors' fees chargeable to the estate.

assets of the estate. It is because the Vinioses, and not the estate, would be burdened that I favor double costs pursuant to Mass.R.A.P. 25 and the award of counsel fees.[6] Also, I suggest that the probate judge who is requested to approve the executors' account look very closely at fees and litigation expenses attributable to this matter that may have been unnecessary or generated by improvident judgment.

---

[6] The decedent desired that much of her estate go to eleemosynary activities and causes and not be chewed up in needless litigation.