**Heinz WARTSKI, Plaintiff, Appellee,**

v.

**Terence W. BEDFORD, Defendant, Appellant. (Two Cases)**

**Heinz WARTSKI, Plaintiff, Appellant,**

v.

**Terence W. BEDFORD, Defendant, Appellee.**

**Nos. 90–1119, 90–1484 and 90–1485.**

United States Court of Appeals, First Circuit.

Heard Nov. 7, 1990.

Decided Feb. 7, 1991.

Richard W. Renehan, with whom Timothy J. Dacey, Jane S. Schacter and Hill & Barlow, Boston, Mass., were on the brief, for defendant, appellant.

Edward F. Haber, with whom Michelle H. Blauner and Shapiro, Grace & Haber, Boston, Mass., were on the brief, for plaintiff, appellee.

Before SELYA, Circuit Judge,
BROWN,* Senior Circuit Judge, and
BOWNES, Senior Circuit Judge.

BOWNES, Senior Circuit Judge.

In this diversity jurisdiction case, defendant-appellant, Terence W. Bedford, appeals from a jury verdict finding him liable for breach of a fiduciary duty to plaintiff-appellee Heinz Wartski. The complaint alleged two theories of liability: breach of a fiduciary duty by Bedford as a director and officer of a close corporation (Count I); and breach of a fiduciary duty by Bedford as a partner of Wartski (Count II). The court directed a verdict for the defendant on Count I. The jury answered "yes" to the following question:

*Breach of Fiduciary Duty*

1. Do you find that the Plaintiff Wartski has established by a preponderance of the evidence that the Defendant Bedford, a partner in the partnership of Fleet Tech company, acquired a business opportunity of the partnership for himself in connection with the purchase of Fleet Tech, Inc.'s shares of stock and convertible debentures?

The jury awarded Wartski $261,000 in damages. We affirm.

There are three issues before us: whether the court erred in denying Bedford's motions for a directed verdict and judgment notwithstanding the verdict on Count II; whether the court's instructions to the jury were erroneous; and whether the damages awarded were erroneous as a matter of law.

* Of the Fifth Circuit, sitting by designation.

## I. MASSACHUSETTS LAW

■ An overview of Massachusetts law [1] on business opportunity and the duty owed by one partner to another and the partnership is necessary to understand the facts and their implications. Although most of the cases involve the duty owed by one stockholder of a close corporation to the other stockholders, that duty is based upon the duty imposed upon one partner to another. In *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 328 N.E.2d 505 (1975), the court held:

> Because of the fundamental resemblance of the close corporation to the partnership, the trust and confidence which are essential to this scale and manner of enterprise, and the inherent danger to minority interests in the close corporation, we hold that stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another. In our previous decisions, we have defined the standard of duty owed by partners to one another as the "utmost good faith and loyalty." *Cardullo v. Landau*, 329 Mass. 5, 8, 105 N.E.2d 843 (1952); *DeCotis v. D'Antona*, 350 Mass. 165, 168, 214 N.E.2d 21 (1966). Stockholders in close corporations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation.

*Id.* 328 N.E.2d at 515 (footnotes omitted). The court then went on to quote Cardozo's famous definition of the duty of partners and participants in a joint venture: "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Id.* at 516, *quoting Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928). In *Energy Resources Corp. Inc. v. Porter*, 14 Mass.App. 296, 438 N.E.2d 391 (1982), the court held that an officer of a close corporation has a fiduciary duty not to divert a corporate opportunity for his own benefit. *Id.* 438 N.E.2d at 393. The defense in *Energy Resources* was "refusal to deal." The court held: "We conclude that before a person invokes refusal to deal as a reason for diverting a corporate opportunity he must unambiguously disclose that refusal to the corporation to which he owes a duty, together with a fair statement of the reasons for that refusal." *Id.* 438 N.E.2d at 395. We dealt with the Massachusetts corporate opportunity doctrine in *In re Tufts Electronics, Inc.*, 746 F.2d 915 (1st Cir.1984). We held that because the corporate opportunity doctrine "is a rule of disclosure" it did not apply to the sole shareholder, director and president of a corporation because such person "cannot be accused of defrauding or concealing information from himself in his role as sole corporate director." *Id.* at 917. As the recitation of facts will disclose, that is not the situation here.

The Massachusetts Supreme Judicial Court (SJC) seems to have moved beyond merely requiring full disclosure in freeze-out situations. In *Coggins v. New England Patriots Football Club*, 397 Mass. 525, 492 N.E.2d 1112 (1986), it held that "in freeze-out situations ... where a controlling stockholder and corporate director chooses to eliminate public ownership ... a judge should examine with closest scrutiny the motives and the behavior of the controlling stockholder." *Id.* 492 N.E.2d at 1117. In *Bodio v. Ellis*, 401 Mass. 1, 513 N.E.2d 684 (1987), the SJC stated: "The shareholders in a close corporation owe to each other duties of the utmost loyalty, trust and confidence." *Id.* 513 N.E.2d at 688–89. We end our overview with *Meehan v. Shaughnessy*, 404 Mass. 419, 535 N.E.2d 1255 (1989), in which the court stated:

> It is well settled that partners owe each other a fiduciary duty of "the utmost good faith and loyalty." *Cardullo v. Landau*, 329 Mass. 5, 8, 105 N.E.2d 843 (1952). *Shelley v. Smith*, 271 Mass. 106, 115, 170 N.E. 826 (1930). *Holmes v. Darling*, 213 Mass. 303, 305, 100 N.E. 611 (1913). As a fiduciary, a partner

---

1. The parties agree, as do we, that Massachu- setts law controls.

must consider his or her partners' welfare, and refrain from acting for purely private gain.

*Id.* 535 N.E.2d at 1263.

We distill from these cases the principle that a partner has a fiduciary obligation to the partnership of the utmost good faith and loyalty and cannot divert a business opportunity for his own gain without first making a complete and unambiguous disclosure to the partnership. We now turn to the facts.

## II. THE EVIDENCE

We have described the standard of review that governs as follows:

The yardstick by which we take the measure of a refusal to grant a directed verdict is the same as that which we apply to the denial of a judgment n.o.v. *Joia v. Jo–Ja Service Corp.*, 817 F.2d 908, 910 (1st Cir.1987); *DeMars v. Equitable Life Assur. Soc. of U.S.*, 610 F.2d 55, 57 (1st Cir.1979). In conducting that exercise, we may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence. *Miranda v. Munoz*, 770 F.2d 255, 257 (1st Cir.1985). Rather, we must examine the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the nonmovant. *Fishman v. Clancy*, 763 F.2d 485, 486 (1st Cir.1985); *Cazzola v. Codman & Shurtleff, Inc.*, 751 F.2d 53, 54 (1st Cir.1984). Put another way, "[w]e take the facts as shown by the [nonmovant's] evidence and by at least such of [movant's] uncontradicted and unimpeached evidence as, under all the circumstances, the jury virtually must have believed." *Karelitz v. Damson Oil Corp.*, 820 F.2d 529, 530 (1st Cir.1987). A judgment notwithstanding the verdict should be granted only when the evidence, viewed from this perspective, is such that reasonable persons could reach but one conclusion. *Hubbard v. Faros Fisheries, Inc.*, 626 F.2d 196, 199 (1st Cir.1980); *Harrington v. United States*, 504 F.2d 1306, 1311 (1st Cir.1974).

*Wagenmann v. Adams*, 829 F.2d 196, 200 (1st Cir.1987).

This case had its genesis sometime in 1979 when the plaintiff, Heinz Wartski, an electronic engineer, conceived the idea of a data collector device for motor vehicles. The data collector would provide a complete analysis of the operation of a motor vehicle in terms of fuel consumption and acceleration. In January 1980, Wartski left his job and concentrated all of his time and energy on bringing his concept to life. In 1983, Wartski received a patent on his data collector.

Defendant Terence Bedford was a neighbor of Wartski's in Brookline, Massachusetts. Wartski had a casual conversation with Bedford in the spring of 1980, in which he described his device. About two weeks later, Bedford came to see Wartski and told him that he might have some interest in the data collector. Wartski knew that in order to market the collector money would have to be raised, and someone with managerial ability would be needed. Wartski had no experience in either raising money or directing a development enterprise. He therefore asked Bedford about his background. Bedford told Wartski that he was familiar with the venture capital world. The conversation concluded with Bedford's indicating that he was interested in the production of a data collector as described by Wartski, and that he would do some research to determine its viability.

Bedford's background and experience was in the investment field. He received a MBA from Harvard Business School in 1966. After a stint working for E.F. Hutton and then for the Mugar family as an investment advisor, he formed his own consulting firm in 1978. The purpose of the firm was to help companies get started and obtain financing; it also gave investment advice to individuals.

Bedford met again with Wartski at Wartski's house. Bedford told Wartski that he had looked into the situation, that his findings were favorable and that he was definitely interested in joining forces with Wartski. It was agreed in January of 1980 that Bedford would take on the responsibil-

ity for obtaining venture capital and managing the project for a 40% share in it. Wartski, who would provide the engineering and technical expertise, was to have a 60% interest in the project. Wartski continued to work full time on the project, but Bedford could not do so immediately because of other projects in which he was involved. Neither party would draw any funds for salary or wages during the start-up phase.

Shortly after this, both men decided that two experts were needed for the project: one to write a computer program for the data collector and the other, a person with expertise in the transportation field. Bedford suggested Dr. Peter Sherwood for the computer programming and Professor Daryl Wycoff of the Harvard Business School as the transportation expert. Sherwood was given a 20% share in the venture and Wycoff 10%. In order to get Bedford more interested in the project, Wartski upped Bedford's share to 35% and reduced his own by 5%; he and Bedford, therefore, became equal partners in the project with each owning 35%.

The formal organization of the venture and raising capital for it started in June 1981 when the Fleet Tech Company, a Massachusetts limited partnership, was formed. The partnership consisted of Wartski and Bedford as general partners and Sherwood and Wycoff as class B limited partners. There were also two class A limited partners who invested a total of $300,000 for working capital. In March of 1982, the partnership raised an additional $264,000 by creating class C limited partnership interests. This required a Restated Limited Partnership Agreement, which was executed on March 24, 1982.

The next step was the formation of Fleet Tech, Inc., a Massachusetts corporation, on August 13, 1982. The partnership transferred all of its assets to the corporation in return for shares of common stock. The assets transferred to the corporation consisted primarily of the data collector, the then pending patent rights to it (patent granted in 1983) and the data collector technology. Bedford became president of

the corporation and Wartski its chief engineer. On August 25, 1982, additional shares of common stock in the corporation were issued to investors in return for a total of $1,250,000. The sole function of the partnership was as an investor in the corporation.

On August 25, 1982, a voting agreement was executed by all of the shareholders of the corporation. The voting agreement, Article 5 of the Articles of Agreement, contained a restriction on voluntary transfers of stock. It prohibited stockholders and transferees of shares from selling corporate stock without first giving written notice to the corporation identifying the terms of the proposed transaction and offering the shares to the corporation for purchase. The corporation had twenty days from receipt of the notice to purchase all or any of the stock upon the terms and conditions of the specified transaction. The selling stockholder also had the duty to offer any shares not purchased by the corporation to the other stockholders on the same terms as the specified transaction; the other shareholders had twenty days to respond to the offer.

Shortly after the corporation was formed, Wartski and Bedford entered into identical employment agreements with the corporation. Wartski worked full time for the corporation from August of 1982 to August of 1983, when he was discharged. Despite the efforts of Wartski and Bedford and the infusion of funds from investors, the venture did not take off as anticipated. Bedford and Wartski differed on how the corporation should be run. Bedford recommended to the board of directors in August of 1983 that Wartski no longer be allowed to work for the corporation. The recommendation was followed. Wartski remained a director of the corporation and a general partner of the partnership, but he no longer worked for the corporation on a day-to-day basis.

The corporation continued to attract investors during 1983 and the first part of 1984. In May 1983, 12,500 shares of common stock were purchased for $500,000. In August 1983, the corporation issued

$600,000 in convertible debentures due September 1, 1985. The debentures were made subject to the same sale restrictions as was the common stock. In April 1984, another $200,000 was advanced against convertible debentures due April 30, 1987. By August 1984, the corporation was in dire financial straits. Its money was all but gone and its debts were mounting. The board of directors met in August 1984 to discuss the financial problems.[2] The outside investors, who now controlled the corporation, made it clear that they had gone to the well for the last time. Austerity measures were taken, but they only postponed the inevitable. By November of 1984, the corporation was insolvent and ripe for bankruptcy. As of November 1984, the equity interests in the corporation were held as follows. The partnership owned 67,333.50 shares divided as follows: Wartski—23,566.725 shares; Bedford—23,566.725 shares; Sherwood—13,466.700 shares; Wycoff—6,733.350 shares. The outside investors held a total of 92,916.50 shares of stock and $800,000 in convertible debentures. The debentures were convertible into stock at the rate of $2.00 per share.

We now get to the heart of the case. At a meeting of the board of directors on November 13, 1984, the financial condition of the corporation was discussed in detail. The investors reiterated that no more money would be made available by them. The directors voted to authorize Bedford either to sell the company or to file for bankruptcy. After the vote, Bedford offered to buy the shares and debentures for a nominal sum ($1.00). Bedford told the investors that if he could keep the business going, a buyer might be found for a price that would pay the employees and creditors what was due them with "something left over." Wartski did not attend this meeting.

The minutes of the board of directors meeting of November 13 were sent to Wartski by Bedford on November 14. The letter accompanying the minutes stated, *inter alia*, "As you can see our condition is very grave. If you have any comments, please call me." Prior to receiving the minutes of the November 14 meeting, Wartski was not aware of any proposed tender offer to be made by Bedford. On December 6, 1984, Bedford sent Wartski another letter with enclosures. The letter stated, "This is to inform you that I am making a tender offer for Convertible Debentures and Common Stock to all holders of the debentures and most of the stockholders." The letter referred to the enclosures for specific details. It ended by stating: "If you would like me to purchase your securities, please notify me as soon as possible." The enclosures contained the offer of Bedford to purchase the stock and/or debentures from each owner for $1.00.

After receiving the letters and enclosed material from Bedford, Wartski had a conversation with Bedford. The essence of the conversation was as follows: Wartski told Bedford that what Bedford was doing was contrary to the agreement they had; that Bedford was breaching the two partnership agreements and the corporate agreement. Wartski also told Bedford that with all of the investors leaving the project, the original partners should share whatever there was on the basis of the partnership agreement (35% each for Wartski and Bedford, 20% for Sherwood and 10% for Wycoff). Bedford replied to Wartski by asserting that since he was the most instrumental in bringing money into the corporation, he had the sole right to purchase the shares of the investors. When Wartski demurred, Bedford said: "That was life in the big city." Wartski was emphatic that Bedford told him that the investors would sell only to him: "that the investors would not speak with anyone else or offer it to anyone else except him." Wartski was convinced by the end of the conversation that Bedford was determined to go ahead and there was nothing he could do.

---

2. Wartski was present at this meeting. In August of 1984, he began preparations to own and operate a Radio Shack franchise in New Hampshire. At the time suit was brought, Wartski was a New Hampshire resident.

There was evidence from which the jury could find that at least some of the investors did not care who purchased their stock. Two of the investors, Henry Harris and Welch & Forbes, realized tax losses from the sale of their stock and debentures. It was the sale, not the purchaser, that was important. Moreover, Harris made it clear by letters to Bedford dated December 19, 1984, and April 5, 1985, that his agreement to sell was subject to the restrictions of Article 5 of the Articles of Agreement: that if the company or any security holder elected to exercise his right of first refusal as to the transfer of the securities, that Bedford should transfer to the person so electing.

On December 21, 1983, Bedford sent Wartski a copy of a notice, dated December 20, from Bedford to their investors showing a transfer of a total of 27,500 shares of stock to Bedford for $4.00 ($1.00 to each investor). The notice also contained a space for waiving Article 5 of the corporation's Articles of Agreement. This was the first notice Wartski had that Bedford was actually buying the investors' securities, that his offer to do so had been accepted. The letter accompanying the notice of sale of stock stated, "If you have any comments on this, please call me immediately." Although the record on this is confusing [3] we think the jury could certainly have found that Wartski did call Bedford. During the conversation, he told Bedford that he did not have the right to appropriate all the shares without sharing them with the partnership. Wartski also told Bedford that he would like permission to consult with the company attorney about the matter. Wartski asked Bedford's permission to consult with the company attorney because by letter of April 17, 1984, Bedford told Wartski that he had instructed the company's attorney to bill Wartski, not the company, for any inquiries Wartski should make of him.

At no time in 1984 or 1985 did Wartski receive notice of all the purchases of common stock and debentures actually made by Bedford. The only notice he received was of the purchase of 27,500 shares of stock for $4.00 and the purchase of 41,128.-25 shares for $1.00 by agreement dated April 10, 1985. In fact, Bedford purchased a total of 88,916.50 shares of stock and $800,000 in convertible debentures for about $10. This means that Wartski did not know of the purchase by Bedford of an additional 20,288.25 shares of stock and his purchase of $800,000 in debentures.

There was a telephone meeting of the board of directors of the corporation on September 25 and September 30, 1985. Wartski attended the meeting by phone on both dates. The directors were informed by Bedford that he had begun discussions about a sale of the corporation's assets with the Bendix Heavy Vehicle Systems Division of Allied Signal Corporation and the Carter Hiller Tractor Corporation. On March 28, 1986, there was a special meeting of the shareholders of the corporation which Wartski attended telephonically. The shareholders, including the general partnership, approved "the sale of assets and technology as described in the Purchase Agreement, Patent and Technology License and Assignment of Trademarks and Goodwill Agreement" to Bendix.

The following stipulation is part of the record:

On April 11, 1986, Allied Corp., through its operating unit, Bendix Heavy Vehicle Systems, acquired assets of the Corporation and entered into a Patent and Technology License Agreement, which provided for an initial down payment and royalty payments in future years. The immediate benefits received from Bendix acquisition were as follows:

| | |
|---|---|
| Initial Payment for License Patent Technology | $450,000.00 |
| Reimbursement for Operating Expenses Prorated to 3/1/86 | $ 28,180.00 |
| Purchase of Assets at Book Value | $412,087.14 |
| TOTAL | $890,267.14 |

Pursuant to the terms of the Patent and Technology License Agreement, min-

3. The record reads: "Mr. Bedford asked me in the letter to call him if I had any comments, which I didn't so I didn't call him, and, again, told him that I reiterated what I told him previously."

imum future royalty payments of $600,-000 each are due on December 31, 1991 and December 31, 1996 less royalty payments received prior to each payment date.

In December, 1987, Allied offered to make a lump-sum payment of $617,700 in lieu of the royalty payments of $1,200,000. The offer was not accepted.

Immediately after the first payment by Bendix, Bedford paid himself $60,000 in back pay and accrued vacation time. He also paid himself just under $128,700 as accrued interest through June 30, 1986, on the convertible debentures he had purchased.

## III. LIABILITY

### A. *Business Opportunity*

Defendant's first line of attack is that there was no "Business Opportunity" in this case. This, of course, is a mixed question of law and fact. For the law part of the question we turn to the Massachusetts cases. Business opportunity is described in *Lincoln Stores v. Grant*, 309 Mass. 417, 34 N.E.2d 704, 707 (1941), as "property in which the corporation has an interest already existing, or in which it has an expectancy growing out of an existing right, or to cases where the officers' interference will, in some degree, prevent or hinder the corporation in effecting the purpose of its creation." Similarly, in *Black v. Parker Mfg. Co.*, 329 Mass. 105, 106 N.E.2d 544 (1952), the court defined a business opportunity as: "property which is necessary for the business of the corporation, and which the officer knows the corporation desires to acquire and intends and is able to purchase and pay for, in order to protect and develop its business interests...." *Id.* 106 N.E.2d at 549. The Supreme Judicial Court broadened the definition of business opportunity in *Durfee v. Durfee & Canning*, 323 Mass. 187, 80 N.E.2d 522 (1948). It stated:

We do not concur in the argument of counsel for the defendant to the effect that the test is whether the corporation has an existing interest or an expectancy thereof in the property involved, being of the opinion that the true basis of the governing doctrine rests fundamentally on the unfairness in the particular circumstances of a director, whose relation to the corporation is fiduciary, "taking advantage of an opportunity [for his personal profit] when the interest of the corporation justly call for protection. This calls for the application of ethical standards of what is fair and equitable * * * [in] particular sets of facts." Ballantine on Corporations (Rev.Ed.1946) 204–205.

*Id.* 106 N.E.2d at 529.

Applying the *Durfee* test of fundamental fairness, we think that the jury could have properly found that there was a business opportunity in this case—the purchase of the investors' stocks and debentures for the proverbial song—and that Bedford took advantage of the opportunity for his personal profit.

The district court's business opportunity instruction to the jury was:

The plaintiff, Wartski, has the burden of proof to prove by a preponderance of the evidence that the purchase of the shares and debentures by Bedford was a business opportunity.

In determining whether a partnership business opportunity existed, you may consider whether the opportunity was a practical advantage to the partnership, whether the opportunity was related to or in the area of the business activity of the partnership, and whether the partnership had any interest in or would receive any benefit from the purchase of Fleet Tech, Inc.'s shares and debentures.

Defendant did not object to this instruction. Passing the question of the application of Fed.R.Civ.P. 51, we find no error in the instruction and hold that the question of business opportunity was properly submitted to the jury.

### B. *Violation of a Fiduciary Duty to Partnership*

Defendant's next line of attack is that even if there was a business opportunity, his purchase of the stock and debentures did not violate any duty he owed the

partnership. Defendant advances a multi-faceted argument on the issue. He first argues that he fully disclosed his tender offer. Bedford's acquisition could rise above his fiduciary duty only if accompanied by a good faith disclosure. "[T]he corporate opportunity doctrine is a rule of disclosure." *In re Tufts Electronics, Inc.*, 746 F.2d at 917. "In the context of the repurchase of company stock from an officer-director, good faith requires a full and honest disclosure of all relevant circumstances to permit a disinterested decision maker to exercise its informed judgment." *Dynan v. Fritz*, 400 Mass. 230, 508 N.E.2d 1371, 1378 (1987). "A partner has an obligation to 'render on demand true and full information of all things affecting the partnership to any partner.' G.L. c. 108A, § 20." *Meehan v. Shaughnessy*, 535 N.E.2d at 1264. Whether Bedford made a complete disclosure to Wartski of all the facts surrounding his purchase of the stocks and debentures was an issue of fact for the jury. The jury had sufficient evidence upon which to make findings that Bedford failed to completely disclose all the circumstances surrounding his purchase of the stocks and debentures.

There was evidence from which the jury could have found that Bedford did not fully disclose to Wartski the extent of his tender offer. Bedford failed to inform Wartski in December 1984, that he had entered into agreement with the investors to purchase all their shares and convertible debentures. Wartski was never notified by Bedford that his offers of purchase to the investors had been accepted. The purchases were completed in April of 1985; by that time Bedford had complete control of the corporation. Wartski was never advised of Bedford's purchase of 88,916.50 shares of stock and $800,000 worth of convertible debentures for less than $10.00. Bedford admitted under examination by Wartski's attorney at trial that his disclosures to Wartski were not complete. He attributed this to inadvertent error, but the jury could have found otherwise. Moreover, the jury could have found that Bedford deliberately lied when he told Wartski that the investors would sell only to him (Bedford).

There was evidence from which it could be reasonably inferred that the investors were selling to take advantage of tax losses and they did not care who purchased their stock and debentures.

Defendant further argues that the partnership expressed no interest in making a tender offer of its own. This overlooks the fact that Wartski objected by telephone to what Bedford was doing. He told Bedford that his tender offer violated the limited partnership agreement.

■ Defendant's next argument is that the partnership was insolvent and unable to make a tender offer with any chance of succeeding. Since Bedford's cost of purchasing the stock and debentures came to less than $10, it seems obvious that the financial condition of the partnership was not an obstacle to the partnership's making a tender offer. The court in *Durfee* rejected a similar argument, stating: "In any event the argument that a fiduciary is not subject to the general rule here involved where the venture is one that the corporation itself is unable to take advantage of is not persuasive." 80 N.E.2d at 530. As we held in *Robinson v. Watts Detective Agency*, 685 F.2d 729, 735 (1st Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953, 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983), neither the financial outlook of a corporation nor the intention of its stockholders and directors to continue business or liquidate it is determinative of the value of the corporation.

Linked to this financial inability argument is Bedford's assertion that the business opportunity was created by his own efforts, business acumen and experience in obtaining a buyer. It is true that Bedford interested Bendix in the corporation and negotiated the sale. But it is also true that Bendix's primary object was to obtain the data collector, the patent rights to it, and the associated technology. This package was conceived and developed by Wartski; it was his brainchild.

Defendant's argument that the tender offer did not injure the partnership has a hollow ring. In return for an investment

of less than $10, Bedford gained full control of a corporation whose assets were thereafter purchased for $890,267.14 plus $1,200,000 in future license payments. There could be no injury to the partnership only if Bedford did not have a fiduciary duty to the other partners. Because there was evidence from which the jury could have found that Bedford did not make a full and complete disclosure of his tender offer and his subsequent purchases of the investors' stock and debentures, Bedford could not escape his ongoing fiduciary duty to the partnership. He owed it a fiduciary duty of the utmost good faith and loyalty; he had a duty to consider his partner Wartski's welfare and to refrain from acting for purely private gain. *Meehan v. Shaughnessy*, 535 N.E.2d at 1263.

■ It could be found that Bedford deliberately flouted his partnership fiduciary duty to Wartski. Bedford was asked to join the enterprise by Wartski because of his expertise in raising venture capital for start-up businesses. Wartski relied on Bedford's business knowledge and experience. Where one of the partners has superior business knowledge and experience, which is relied upon by the other, the "punctilio of honor" fiduciary standard annunciated by Justice Cardozo applies. *Slattery v. Bower*, 924 F.2d 6, 10 (1st Cir. 1991). As already detailed, there was a plethora of evidence from which it could be found that Bedford did not meet his obligations as a partner fiduciary.

Nor can the fiduciary obligation be avoided on the grounds that the partnership agreement authorized Bedford's actions. In the first place, whether the agreement did so depends on how it is interpreted. Section 5.4 of the agreement states: "General Partners shall not be prevented from engaging in other activities for profit, whether in research and development or otherwise, and whether or not competitive with the business of the partnership." It is at least debatable whether this language allows one partner to obtain for himself the exclusive right, title and interest to the patent rights to an invention and its technology which was the heart and soul of the partnership venture and the brainchild of the other partner.

■ Secondly and more importantly, even if the partnership agreement can be interpreted as defendant claims, it cannot nullify the fiduciary duty owed by Bedford to the partnership. The fiduciary duty of partners is an integral part of the partnership agreement whether or not expressly set forth therein. It cannot be negated by the words of the partnership agreement. *Labovitz v. Dolan*, 189 Ill.App.3d 403, 136 Ill.Dec. 780, 786, 545 N.E.2d 304, 310 (1 Dist.1989). Or to put it another way: "Exculpatory provisions of corporate articles create no license to steal. They do no more than to validate otherwise invalid agreements *if such agreements are shown to be fair.*" *Irwin v. West End Development Co.*, 342 F.Supp. 687, 701 (D.Colo.1972), *aff'd in part and rev'd in part on other grounds*, 481 F.2d 34 (10th Cir.1973), *cert. denied, Vroom v. Irwin*, 414 U.S. 1158, 94 S.Ct. 915, 39 L.Ed.2d 110 (1974) (emphasis added).

Based on the facts and the applicable law, we hold that Count II was properly submitted to the jury and that the motions for directed verdict, judgment n.o.v. and new trial were properly denied.

## IV. DAMAGES

■ The jury awarded the plaintiff $261,000 in damages. Defendant did not object to the jury instruction on damages but claims that the damages were "unsupported by the evidence and erroneous as a matter of law." It was error, therefore, defendant argues, for the district court to deny his motion to alter or amend the judgment and/or his motion for a new trial.

We start our analysis with the pertinent jury instructions on damages:

The transfer of shares and debentures, the partnership business opportunity in this case, is a cause of injury to Wartski if there is an identifiable—if there is an identifiable monetary loss to the partnership, and thereby to Mr. Wartski, and that the transfer of shares and deben-

tures to Bedford played a substantial part in bringing about that monetary loss.

\* \* \* \* \* \*

When considering the issue of damages, bear in mind that Wartski's recovery against Bedford, if any, must be limited to the monetary losses that flowed from Bedford's breach of his fiduciary duty to his partner, Wartski.

In considering the issue of damages, you are instructed that you should assess the amount you find to be justified by a preponderance of the evidence as full, just, and reasonable compensation for the Plaintiff's monetary loss resulting from any breach of fiduciary duty; no more and no less.

Defendant concedes that the damages awarded followed the formula suggested by plaintiff's counsel in his closing argument who argued that the evidence showed that the present value of the shares and debentures was $746,400. This was arrived at by adding together two amounts: the $128,700, which Bedford paid to himself out of the first payment by Bendix as accrued interest on the convertible debentures, and the lump-sum offer of payment in the amount of $617,700, which was refused. The total of these two amounts is $746,400. The jury then took 35% of this sum, which was Wartski's share of the partnership, to arrive at the award of $261,000 (rounded off from $261,400).

There can be no doubt that there was evidence to support the jury's award. We, therefore, turn to defendant's second contention that the damages were erroneous as a matter of law. He argues that, in a business tort case, a plaintiff is limited to two theories of damages: plaintiff's actual losses; or defendant's profits (unjust enrichment). Defendant contends that in order to recover on the theory of actual losses, Wartski had to prove that he would have realized the business opportunity himself and he failed to so prove. Defendant argues in the alternative that if an unjust enrichment theory is applied, the amount of

damages is $44,800: 35% of the $128,000 [4] that Bedford appropriated to himself as interest on the debentures.

The problem with defendant's argument on damages is that neither theory was advanced in the district court. There was no requested instruction on a theory of damages by defendant, and the record is barren of any reference to a theory of damages before the case was submitted to the jury. At trial, the defendant focused exclusively on liability. Except in unusual circumstances, not present here, we do not consider on appeal an issue that the district court was not given an opportunity to consider. The rule has been stated as follows:

It is by now axiomatic that an issue not presented to the trial court cannot be raised for the first time on appeal. *Roto–Lith, Ltd. v. F.P. Bartlett & Co.,* 297 F.2d 497, 500 (1st Cir.1962); *Demelle v. Interstate Commerce Commission,* 219 F.2d 619, 621 (1st Cir.1955). Although this rule is not absolute, it is relaxed only "in horrendous cases where a gross miscarriage of justice would occur." *Newark Morning Ledger Co. v. United States,* 539 F.2d 929, 932 (3rd Cir.1976); *Hormel v. Helvering,* 312 U.S. 552, 556–57, 61 S.Ct. 719 [721–22], 85 L.Ed. 1037 (1941). In addition, the new ground must be "so compelling as virtually to insure appellant's success." *Dobb v. Baker,* 505 F.2d 1041, 1044 (1st Cir. 1974).

*Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir.1979). *See also Hernandez–Hernandez v. United States,* 904 F.2d 758, 763 (1st Cir.1990); *Lane v. First Nat'l Bank of Boston,* 871 F.2d 166, 175 (1st Cir.1989); *United States v. Serrano,* 870 F.2d 1, 16–17 (1st Cir.1989).

This error of omission was compounded by defendant's failure to object to the district court's instruction on damages. This circuit enforces vigorously the stricture of Fed.R.Civ.P. 51, which states explicitly: "No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating dis-

**4.** Defendant's calculations use the figure of $128,000, not the correct one—$128,700.

tinctly the matter objected to and the grounds of the objection." Our position on Rule 51 has been stated as follows:

Even if plaintiff's requested instruction had been proper, counsel failed to raise that objection again subsequent to the actual charge. According to a long line of precedents in this circuit, such an omission constitutes waiver of the objection pursuant to Federal Rule of Civil Procedure 51. *See, e.g., Brown v. Freedman Baking Co., Inc.,* 810 F.2d 6, 9 (1st Cir.1987); *Coy v. Simpson Marine Safety Equipment, Inc.,* 787 F.2d 19, 26 (1st Cir.1986); *Emery–Waterhouse Co. v. Rhode Island Hosp. Trust Nat'l Bank,* 757 F.2d 399, 411 (1st Cir.1985); *McGrath v. Spirito,* 733 F.2d 967, 968–69 (1st Cir.1984); *Monomoy Fisheries, Inc. v. Bruno & Stillman Yacht Co.,* 625 F.2d 1034, 1036 (1st Cir.1980); *Carrillo v. Sameit Westbulk,* 514 F.2d 1214, 1219 (1st Cir.1975); *United States v. Taglianetti,* 456 F.2d 1055, 1056–57 (1st Cir. 1972); *Rivera v. Rederi A/B Nordstjernan,* 456 F.2d 970, 976 (1st Cir.1972); *Dunn v. St. Louis–San Francisco Ry. Co.,* 370 F.2d 681 (10th Cir.1966) (Aldrich J., sitting by designation); *Marshall v. Nugent,* 222 F.2d 604, 615 (1st Cir.1955).

*Wells Real Estate v. Greater Lowell Bd. of Realtors,* 850 F.2d 803, 809 (1st Cir.), *cert. denied,* 488 U.S. 955, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988) (footnote omitted).

There is no reason to relax either rule in this case. The court's instruction on damages was not plainly erroneous, nor did it result in a gross miscarriage of justice. The offer of Bendix to pay $617,700 immediately in lieu of the future payments of $1,200,000 was evidence of what Bendix thought was the present value of the future payments. That the offer was rejected did not nullify it as evidence of the present worth of the future royalty payments.

There is one final housekeeping matter. After verdict, the district court denied plaintiff's motion to impose a constructive trust in favor of plaintiff on the stocks and debentures. In its order the court stated: "The damages the jury awarded plaintiff

represented plaintiff's share of past and future earnings of the stock and debentures of Fleet Tech. Inasmuch as plaintiff has received complete relief under Count II of the Complaint, he is not entitled to double recovery in the form of an equitable remedy." Plaintiff filed a notice of appeal from the order, stating: "[T]his appeal shall be consolidated with appeal No. 90–1119." The issue of the denial of the constructive trust was, however, neither briefed nor argued by plaintiff. The appeal, therefore, is deemed to have been waived.

The judgment of the district court is Affirmed. Costs are awarded to plaintiff-appellee.