974 F.2d 1329
 152 L.R.R.M. (BNA) 2128
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
OMNIX INTERNATIONAL CORPORATION, d/b/a Waterbed World, Respondent.
 No. 91-2106.
 United States Court of Appeals,
First Circuit.
 August 31, 1992
 
 1
 Stephen M. Perry with whom John K. Alberty was on brief for respondent-appellant.
 
 
 2
 John H. Fawley, Attorney, National Labor Relations Board, with whom Jerry M. Hunter, General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, National Labor Relations Board, were on brief for petitioner-appellee.
 
 
 3
 Before Torruella and Boudin, Circuit Judges, and Keeton,* District Judge.FD* Of the District of Massachusetts, sitting by designation.
 
 
 4
 KEETON, District Judge.
 
 
 5
 This case is before us on application of the National Labor Relations Board (the "Board") for enforcement of a cease and desist order. The Board concluded that appellant Omnix International Corporation ("Omnix") violated §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158 (1988), by (1) engaging in threats against employees participating in union activities, (2) causing employees to believe that union activities were under surveillance, (3) discharging an employee because of her union-related activities and/or those of her daughter, and (4) refusing to permit an employee to rescind her resignation because of the employee's past union-related activities.
 
 
 6
 Omnix contends that the decision of the Board is not supported by substantial evidence and has moved in this court to remand to reopen the evidence. We conclude that remand is not appropriate and that the Board's order should be enforced.
 
 I. The Board Decision
 
 7
 The Board reached the following findings and conclusions. Omnix, a retailer of water beds with several stores at different locations within Puerto Rico, is an employer within the meaning of the Act. Union Independiente de Supermercados y Tiendas por Departamentos (the "Union"), a union with which employees of Omnix became affiliated during the pendency of proceedings before the Board, is a labor organization within the meaning of the Act.
 
 
 8
 Omnix generally staffed each of its stores with one regular employee. It had two stores in Plaza Carolina, one store on each of two levels. The store on the second level (Carolina II) was staffed by Marilu Marquez; her husband was employed at the store on the first level (Carolina I). Marquez' mother, Gloria Garcia, worked for Omnix on a part-time basis; she worked principally at Plaza Carolina, but also filled in at other stores when regular employees had a day off. Marquez' sister-in-law, Raisa Musa Quinones (Musa), was assigned to Omnix' Guaynabo store. Musa, by virtue of her marriage to Garcia's ex-husband, was also Marquez' stepmother.
 
 
 9
 In April 1985, Omnix received notice from its landlord at Plaza Carolina that Omnix' month-to-month lease for its Carolina II store would not be renewed. Omnix was advised to vacate the premises on or before May 31, 1985. For business reasons, Omnix, through its officers Stanley Liu, Alan Bennett, and Jaime Rico, decided to shut the Carolina II store by May 4. On May 2, Omnix' officers informed Marquez that the Carolina II store would be closing on May 4.
 
 
 10
 Marquez was invited to resign or to transfer to Omnix' Dorado store. Omnix explained to Marquez that, under Puerto Rican law, Marquez was entitled to displace the employee at the Dorado store who had less seniority than she had. In addition, Omnix offered a third option, that it would aid Marquez if she preferred to seek unemployment compensation.
 
 
 11
 Marquez was pregnant and was concerned about the effects that the longer travel distance to Dorado might have. Omnix did not offer Marquez the option of transferring to any of its other stores, at least one of which-the Guaynabo store-was closer to Plaza Carolina than Dorado. After opposing the transfer to Dorado, Marquez (though she characterizes her actions differently) resigned on May 4.
 
 
 12
 On May 6, however, Marquez arrived at Omnix' warehouse with Garcia and requested the keys to the Dorado store. She met there with Bennett who declined her request, stating his position (which was ultimately upheld by the Board) that Marquez had resigned. In addition, Bennett fired Garcia.
 
 
 13
 The events recounted above are not in dispute on this appeal. Other events occurring in the days that preceded May 6, and events occurring in the weeks that followed, as well as appropriate inferences to be drawn, are in dispute.
 
 
 14
 The Board found that Garcia's dismissal and the failure to allow Marquez to rescind her resignation were motivated by anti-union animus. Marquez was a chief union organizer. Garcia participated in efforts seeking to unionize Omnix, and, perhaps at least as important or more so, was Marquez' mother.
 
 
 15
 At the 1985 hearing, Musa testified that Rico had confronted Musa before May 4 with Rico's knowledge that Marquez was participating in efforts to unionize Omnix and had advised Musa to stay out of the Union. Based on this testimony, the Board found that Omnix was aware of Marquez' efforts to unionize.
 
 
 16
 The Board also found that following May 6 Omnix was required to close at least one of its stores on numerous days. The Board found, again based upon the testimony of Musa, that Omnix was aware on May 6 of circumstances that ultimately contributed to the need to close stores; that is, Musa testified that she had informed Rico before May 6 that she would be out May 6 and that there was a possibility she was going to be entering the hospital and taking sick leave because of her own troubled pregnancy.
 
 
 17
 From this evidence the Board inferred that there was no justifiable business reason for both firing Garcia and not rehiring Marquez. The Board also found, based on Musa's testimony about Rico's overtures to her, that Omnix had conveyed the impression that employees' union activities were under surveillance and had threatened reprisals for engaging in union activities.
 
 II. Subsequent Procedural History
 
 18
 Following the Board's decision in September 1987 affirming in substantial part the findings and conclusions of the Administrative Law Judge (ALJ), Omnix moved to reopen the record to consider new evidence relating to the credibility of Musa, a key witness at the 1985 hearing. Omnix supported its motion with an affidavit allegedly executed by Musa on December 15, 1987 recanting substantially all of her testimony before the ALJ. The Board granted the motion in July 1988.
 
 
 19
 On January 27, 1989, the ALJ granted Omnix' motion to postpone the date for hearing originally set for January 30, 1989 and set March 15, 1989 as a date for receiving additional evidence. On March 9, 1989, however, the ALJ issued an order at Omnix' request granting a postponement of the hearing date until April 17, 1989. On April 14, 1989, the ALJ denied a third motion by Omnix to postpone the hearing date. A hearing was held on April 17, 1989.
 
 
 20
 At the 1989 hearing, Omnix presented additional witnesses. It also submitted into evidence the affidavit of Musa that it had proffered in support of its motion to reopen. The Board submitted a second affidavit, obtained by its own counsel on March 5, 1988 and allegedly executed by Musa, in which Musa denied that she had ever seen the first affidavit and reaffirmed her 1985 testimony. Counsel did not find and produce Musa herself, and she did not appear to testify.
 
 
 21
 On January 5, 1990, after receiving supplemental briefs from the parties on the admissibility of the two affidavits, the ALJ issued a twenty-one page supplemental decision. The ALJ found that he should continue to credit Musa's 1985 testimony. In its own supplemental decision, issued February 7, 1991, the Board made a similar finding. On March 6, 1991, Omnix once again moved to reopen the record, attacking the March 5, 1988 affidavit and proffering evidence in support of the December 15, 1987 affidavit. The Board denied the motion on August 27, 1991.
 
 
 22
 On November 1, 1991, the Board petitioned this court for enforcement of its Order. On December 3, 1991, Omnix filed yet another motion before the Board to reopen the record. That motion was denied on January 13, 1992. On January 30, 1992, Omnix filed a motion to reconsider. On March 13, 1992, Omnix filed a motion for leave to adduce additional evidence before this court. That motion was denied by a duty panel of the court, without prejudice to being renewed before this panel.
 
 III. Motion to Adduce Additional Evidence
 
 23
 Musa's testimony provides evidentiary support for all four of the violations of the Act found by the Board. Omnix argues that late-discovered evidence demonstrates that Musa's testimony is not credible, and has moved in this court to remand to consider that evidence. We deny that motion.
 
 
 24
 Omnix suggests numerous reasons that the record must be reopened. We find none of them persuasive.
 
 
 25
 Omnix alleges that criminal activities allegedly engaged in by Musa in 1989 and 1990, involving cocaine use and, in the words of Fed. R. Evid. 609, crimes of "dishonesty," demonstrate that she is not a credible witness. Issues of credibility, however, are not for this court to resolve on review, and we cannot fault the Board's implicit finding that evidence proffered by Omnix of crimes committed in and after 1989 did not warrant reopening the evidence to make a revised evaluation of Musa's credibility when she testified in 1985.
 
 
 26
 Omnix also proffers the testimony of a handwriting expert who will testify that the two affidavits prepared after the 1985 hearing date were both signed by Musa. In the first affidavit, prepared in December 1987 and produced by Omnix' counsel, Musa recanted her testimony before the ALJ. Omnix moved to reopen the evidence after obtaining that affidavit, and the Board granted that motion. In the second affidavit, prepared in March 1988 and produced by counsel for the Board, Musa denied ever having seen the first affidavit. Despite nine months delay between the time the Board granted the motion to reopen the evidence and the hearing (including over two months' postponement at Omnix' request), Omnix was not able to find Musa and produce her at the hearing. Nevertheless, both affidavits were admitted into evidence by the ALJ at the hearing held in April 1989.
 
 
 27
 Omnix has failed to present a satisfactory reason for its delay in proffering the testimony of its handwriting expert. Omnix argues that it did not obtain a copy of the second affidavit until the 1989 hearing. Omnix has proffered, however, an affidavit of its Vice President, Alan Bennett, in which Bennett swears that in a taped conversation among Musa, Rico, and himself held on March 19, 1988 Musa disavowed her second affidavit only two weeks after it was made. Thus, Bennett's affidavit demonstrates that Omnix was aware of Musa's second affidavit almost immediately.
 
 
 28
 Omnix made no effort to introduce the taped conversation at the 1989 hearing. Its failure to do so then does not justify its request for another opportunity to do so now. Moreover, in light of Bennett's affidavit, Omnix' attempt at this late date to adduce the testimony of the handwriting expert provides insufficient justification for reopening the record yet again. The Board considered both affidavits and concluded that the first affidavit, when considered in light of the second affidavit as well as other evidence, did not provide an adequate basis for a different evaluation of Musa's credibility from that made at the 1985 hearing.
 
 
 29
 The Board concluded, in denying a second motion to reopen the record by Omnix, that interests of finality and closure weighed heavily in favor of denying Omnix' motion. Omnix was unable to produce Musa at the hearing scheduled for the sole purpose of examining her credibility. Omnix' assurances to the Board and to this court that it would be able to produce her now if allowed still one more opportunity-without any proffer of what her testimony would be and without any proffer of evidence that tends to show that she is available now to testify-cannot justify delaying enforcement of a Board order entered five years ago.
 
 
 30
 Omnix argues that failing to reopen the record to obtain Musa's testimony is a denial of justice and due process. Omnix fails to explain, however, how either justice or due process requires us to give Omnix yet another bite at the apple. Omnix has moved to reopen the evidence five times. Its motion was granted, once. In addition, Omnix was granted additional time to find Musa. At the hearing held April 17, 1989, Omnix placed Musa's first affidavit in evidence and called additional witnesses. The Board's counsel submitted the second affidavit. Although Omnix has appealed the admission into evidence of the second affidavit, the Board declared that it relied on the second affidavit only to the extent that it impeached the first affidavit and not for the truth of matters asserted within it. Without regard to admissibility more generally, at the least the second affidavit was properly used for that purpose. In light of all the evidence, including the second affidavit, the Board's finding that Musa's first affidavit was not convincing is supported by evidence and cannot be overturned by this court.
 
 IV. The Violations
 
 31
 Omnix contends that the Board's findings of violations of the Act are not supported by substantial evidence. Finding ample evidence in the record, we affirm.
 
 
 32
 Once credited, Musa's testimony provides evidence to support the following findings:
 
 
 33
 (1) Omnix (through its Secretary, Rico) was aware of the union activities of Marquez and Garcia.
 
 
 34
 (2) Omnix (through Rico) created an impression in the minds of its employees (or at least one of them-Musa) that their union activities were under surveillance.
 
 
 35
 (3) Omnix (through Rico) threatened reprisals for participation in the Union.
 
 
 36
 In addition, it is undisputed that Omnix fired Garcia and that Omnix refused to allow Marquez to rescind her resignation.
 
 
 37
 Finally, the Board found that the jobs of Marquez and Garcia remained open after they were separated from the company. Omnix argues that there is no evidence to support such a finding. The ALJ found, based on weekly schedules admitted in evidence, that the Guaynabo store was closed on May 7 and 8 for lack of personnel. The Board found that Omnix stores were closed for a total of seven days in May, commencing on May 6.
 
 
 38
 The weekly schedules are very difficult to read; moreover, they may not accurately reflect which stores (if any) were closed on a given date. Omnix' witnesses explained that the weekly schedules are preliminary plans and that company supervisors fill in at stores for which there is no scheduled employee. If a supervisor filled in at a store on a given day, the store would not have been closed on that day even though no employee had been scheduled to work there. Thus, it is impossible, on the cold record, for us to determine which stores, if any, were closed on any given day.
 
 
 39
 Nevertheless, it is clear that there were no fewer than ten days in the month of May when at least one of Omnix' stores had a time slot without an employee scheduled to work. On at least one day, the schedule affirmatively indicates that a store was closed. Even if it is the case, as Omnix argues, that stores showing an open time slot were not necessarily closed, it is at least true that it was necessary either to have a supervisor fill a salesperson's role or to close the store on ten days. Thus, there were at least ten days in the month of May during which there was a vacancy for a salesperson. Moreover, although the June schedules are not in the record other than the schedule for June 1, the June 1 schedule shows two vacant time slots on that day.
 
 
 40
 Because the Board found, supported by evidence, that Omnix was aware that Musa would not be available for work at least on May 6 and perhaps for a longer period (in fact, she never returned to work), and therefore knew that it had a vacancy on the same day that Garcia was fired for lack of work and Marquez attempted to return to work, a prima facie case has been made. Thus, it falls to Omnix to articulate a reason for firing Garcia and for not allowing Marquez to rescind her resignation.
 
 
 41
 The only reasons Omnix has articulated for firing Garcia are that it closed the Carolina II store and Garcia did not have a car and so could not have filled in at Omnix' other stores. This is insufficient, however, to support the assertion that Garcia could not have filled in at another store in light of the ALJ's finding that Garcia's job had for some time entailed filling in at other stores where she was needed. Thus, the ALJ found, with support in the evidence, that the only manifest reason for firing Garcia was "her union activities and/or those of her daughter." The Board concurred that Garcia's "familial relationship" to Marquez played a role in Garcia's discharge.
 
 
 42
 Because Omnix has not raised the issue, we conclude that we need not decide whether the Board's burden is carried if Garcia was fired solely because of her daughter's union activity. Issues that are not briefed or argued are waived on appeal. See, e.g., Wartski v. Bedford, 926 F.2d 11, 22 (1st Cir. 1991).
 
 
 43
 Omnix argues that there is no evidence that supports a finding that Garcia was fired because of anyone's union activities. We conclude, however, that the circumstances showing that Omnix knew, in words attributed to Rico, "everything about the union," combined with the events that occurred during the first week in May 1985 and the lack of any credible explanation of those events by Omnix, provide adequate support for the Board's finding that Omnix' action was motivated by anti-union animus.
 
 
 44
 Omnix makes two additional arguments with respect to its decision not to allow Marquez to rescind her resignation. First, Omnix argues that it was justified in taking into account, when making its decision, Marquez' abrupt resignation and insubordination. Second, Omnix argued at oral argument (though not in its briefs) that a different legal standard applies to a case of refusal to rehire than to a case of wrongful discharge, citing in support of that argument N.L.R.B. v. Rich's of Plymouth, Inc., 578 F.2d 880, 886 (1st Cir. 1978).
 
 
 45
 In Rich's of Plymouth, this court, noting that it was not obvious that the employer has the same obligation to explain its failure to reinstate an employee as it has to explain its decision to discharge, questioned whether the Board might not have, conversely, a heavier burden in relation to a failure of the employer to reinstate. In that case, however, "we [did] not rest our decision on any such difference in defenses and burdens," nor did we suggest any different legal standard or burden. At oral argument, Omnix, too, failed to suggest any concrete proposal or precedent for modification of the burden applicable to this case; it argued only that the burden on the Board must be higher.
 
 
 46
 We think Omnix overstates the point. Of course, it is correct that there may be additional factors that the Board must consider in determining whether a refusal to rehire was motivated by anti-union animus. For example, in this case it was necessary to consider whether Omnix' decision was motivated by the fact that Marquez was insubordinate and resigned abruptly.
 
 
 47
 We are satisfied that the Board gave these possibilities appropriate consideration. The Board nevertheless found that Omnix' decision was motivated by Marquez' union activities and that Omnix had failed to introduce a single credible reason for its refusal to rehire Marquez. Whether we, as factfinders, would have reached the same finding is of no importance. The Board's finding is supported by substantial evidence in the record.
 
 
 48
 The Board's order will be enforced.
 
 
 49
 So ordered.